2001 UT 77

**Harold R. BREWER, Plaintiff and Appellee,**

v.

**DENVER & RIO GRANDE WESTERN RAILROAD, Defendant and Appellant.**

No. 990672.

Supreme Court of Utah.

Aug. 28, 2001.

Randall R. Smart, Salt Lake City, and Richard E. Crow II, Gerald J. Adler, Sacramento, CA, for plaintiff.

E. Scott Savage, Casey K. McGarvey, Salt Lake City, and Jeffrey A. Jackson, Andrew Reinhart, Canonsburg, PA, for defendant.

RUSSON, Associate Chief Justice:

¶ 1 Defendant Denver & Rio Grande Western Railroad Company appeals from a trial court judgment awarding Harold R. Brewer damages for his action brought under the Federal Employers' Liability Act, 45 U.S.C.A. §§ 51–60 (1994). We affirm.

## BACKGROUND

¶ 2 Harold R. Brewer ("Brewer"), plaintiff and appellee in the instant case, began working as a telegrapher for the Denver & Rio Grande Western Railroad Company ("Denver & Rio Grande") in 1965. Twenty-two years later, in 1987, Brewer changed positions within the company and became a clerk. As part of his duties as a clerk, Brewer typed each day on a computer keyboard inputting various train data and "request information." Most days, Brewer would type on the keyboard in this manner for "[t]hree to four hours." However, when the train yard at which Brewer worked became especially busy and thus deflected his efforts to other tasks, he would sometimes type for only two hours per day. Conversely, when the yard's input demands became particularly heavy, Brewer would sometimes type for "up to eight hours" per day.

¶ 3 In December 1991, Brewer began to experience pain and numbness in his hands and wrists. Nearly a year later, in August 1992, doctors diagnosed these problems as carpal tunnel syndrome.[1] As a result, Brewer underwent two surgeries on each hand to alleviate his carpal tunnel syndrome. Following the second procedure, Brewer did not return to work for Denver & Rio Grande because his "doctors advised [him] not to go back to work and do that kind of work."

¶ 4 Subsequently, on April 14, 1994, Brewer filed suit in the Third District Court for Salt Lake County, claiming unspecified damages in lost wages and benefits and $1,500,000 in "[p]ain and suffering" and "[l]oss of enjoyment of life," for Denver & Rio Grande's alleged negligence under the Federal Employers' Liability Act ("FELA"), 45 U.S.C.A. §§ 51–60 (1994). Specifically, Brewer alleged that Denver & Rio Grande's "inadequate appliances, utensils, and equipment" caused his carpal tunnel syndrome. Accordingly, Brewer further alleged that Denver & Rio Grande was liable to him for his injuries pursuant to section 1 of FELA, which provides:

> Every common carrier by railroad while engaging in commerce between any of the several States ... shall be liable in damages to any person suffering injury while he is employed by such carrier ... for such injury or death resulting in whole or in part ... due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment.

*Id.* § 51.

¶ 5 Prior to trial, on July 1, 1998, Denver & Rio Grande filed a motion in limine attempting to exclude, among other things, the causation opinion of Brewer's expert witness, Dr. Robert J. Harrison. Specifically, Denver & Rio Grande contended that Dr. Harrison's testimony was "[s]cientifically [u]nreliable" and thus inadmissible under *State v. Rimmasch*, 775 P.2d 388 (Utah 1989), because he did not follow "an accepted scientifically valid methodology in arriving at his opinions," and because even if Dr. Harrison did employ a "scientifically valid methodology," he did not properly apply that methodology in assessing the cause of Brewer's carpal tunnel syndrome. In response, Brewer argued that Dr. Harrison's causation testimony was "scientifically reliable and relevant" because he properly applied a "qualitative observational

---

1. "Carpal tunnel syndrome is a condition produced by compression of the median nerve as it travels through the carpal tunnel at the wrist, resulting in symptoms of tingling, pain, and weakness in the wrist and in the thumb and first three fingers of the hand. Carpal tunnel syndrome can be caused by a variety of factors.... [In extreme cases, carpal tunnel syndrome may result from m]any assembly line tasks, as well as computer and typing jobs ... and [workplace] furnishings, and even a relatively short period of such repetitive work can cause carpal tunnel syndrome in extremely sensitive individuals." Jay M. Zitter, Annotation, *Workers' Compensation: Recovery for Carpal Tunnel Syndrome*, 14 A.L.R.5th 1, 11–12 (1993).

methodology ... generally accepted in the ergonomic community" to assess the source of Brewer's carpal tunnel syndrome.

¶ 6 On the first day of trial, January 26, 1999, the district court conducted a hearing to consider Denver & Rio Grande's motion in limine. After receiving argument from both sides on the admissibility of Dr. Harrison's causation opinion, the court denied the motion to exclude the evidence. The court ruled from the bench: "I'm going to let [Dr. Harrison] testify. The motion is denied.... [However,] [j]ust because I've made th[is] preliminary ruling[ ] doesn't mean the plaintiff doesn't ha[ve] to put on any foundational [evidence]."

¶ 7 Following the trial court's ruling, Brewer called Dr. Harrison to the stand, where he began explaining the procedure he had employed in assessing the cause of Brewer's carpal tunnel syndrome. Before Dr. Harrison testified to causation itself, however, Denver & Rio Grande renewed its motion to exclude his causation opinion and requested a hearing on the matter. The court therefore conducted another hearing in which it extensively questioned Dr. Harrison about the methodology he had employed to arrive at his causation conclusion—including whether he believed it necessary to know the number of keystrokes typed per day to determine causation; whether he knew how many hours per day Brewer typed while at work; whether typing position and duration must be observed directly or may be obtained "from somebody else"; and whether typing must be "continuous," or if it could instead comprise "generally consistent use" over a period of time, to result in carpal tunnel syndrome. The court also heard further argument on the admissibility of Dr. Harrison's testimony from the parties' respective attorneys, and then denied Denver & Rio Grande's motion. The court ruled:

> I'm satisfied there's sufficient basis here for the doctor to offer his opinions.... Doctor Harrison is a qualified medical doctor. He's done studies and series, he's

studied [carpal tunnel syndrome]. He has a lot of work experience, and I think he's entitled to offer the opinions. I do not think just because it's controversial that means it can never be offered....

> I think the jury's entitled to evaluate, based upon the foundations that are given by the medical experts in this case, assuming it has [a] legitimate basis, and I believe that it does, to evaluate the respective decisions and make their own judgment.... I think this testimony will be helpful to the jury, and they'll either accept it or reject it based upon whether they find it to be persuasive, and so I'm going to allow it. The objection's overruled.

Accordingly, Brewer's attorney resumed questioning Dr. Harrison, to which Denver & Rio Grande again objected, and the trial court overruled the objection.

¶ 8 Upon direct examination, Dr. Harrison testified it was his medical opinion that "Mr. Brewer's work ... caused his carpal tunnel syndrome condition." Dr. Harrison further testified that he formed this opinion based on a number of facts. He explained that he had read Mr. Brewer's deposition in the case, which provided "a lot of detail [as to] exactly what [Brewer] did over his years working for the railroad," an explanation of "how much time [Brewer] spent working at the keyboard," and Brewer's description of "how many hours a day he worked between 1965 and 1992 working at the keyboard." Dr. Harrison also analyzed photographs of Brewer's work station at Denver & Rio Grande, along with photographs of Brewer sitting at the work station in the "position [he was in] when he [wa]s doing his typing for the railroad."[2] In addition, Dr. Harrison reviewed Brewer's medical records, including nerve conduction studies demonstrating his carpal tunnel syndrome, the records from Brewer's two surgeries, and blood sugar tests that had been conducted to determine if Brewer suffered from diabetes. Using this information,

2. Dr. Harrison noted that he also considered the depositions of Dell Felix and Paul France, ergonomists who examined Brewer at his work station and took "measurements of the height of [his] desk[ and] the angles of [his] arms and hands and wrists." Dr. Harrison explained that the findings of Messrs. Felix and France confirmed his conclusion that Brewer's carpal tunnel syndrome was caused by his typing for Denver & Rio Grande.

Dr. Harrison opined that Brewer's carpal tunnel syndrome had been caused by his work at the railroad, specifically by his repetitive keying and poor posture due to the desk and nonadjustable chair provided by Denver & Rio Grande. Dr. Harrison elaborated on his assessment:

First of all, [I assessed] the history from Mr. Brewer that he started to get problems with his hands, the pain, numbness, tingling in his hands.... That was verified by a test that showed without doubt that he actually had the disease.

When I looked at the history from Mr. Brewer, first in the medical records, and then when I talked to Mr. Brewer a few weeks ago, ... [that] history ... was consistent with, or what we find in many patients who have carpal tunnel syndrome....

Second, the test showed that he had it and he had multiple nerve conduction tests.

The third was the exposure that he had. By exposure, what I mean is the risk factors for carpal tunnel syndrome. The risk factors that he has here that I can see from the pictures ..., from talking to Mr. Brewer is [sic] the repetitive keying. [R]epetition is a factor that's well known to cause carpal tunnel syndrome.

... Mr. Brewer has testified ... that he[ ] us[ed the keyboard] an average of four hours a day....

. . . .

The second exposure or risk factor is posture. When I look at the pictures, I would describe Mr. Brewer as a leaner, he's kind of leaning forward, perched over the keyboard, and his hands are up.... So that's called extension when your hands go back.... It's unfortunately common when people work at this kind of furniture [because] people try to find the position that they're comfortable in. And that[ ] position is often the worst position in terms of placing stress across the wrist and causing eventual damage to the nerve to cause carpal tunnel syndrome.

. . . .

And if he's doing simultaneously the repetitive keying, and he's in the awkward posture, those two factors combined are synergistic, ... they're creating more than double the risk factor....

. . . .

The fourth factor would be that he doesn't have any other reason [for developing the syndrome]. So what we would call non-occupational risks, or does he have any other cause, any other medical condition, any other hobby, anything else that could cause this? And my answer to that would be "no."

¶ 9 During trial, Brewer also presented evidence concerning Denver & Rio Grande's duty to provide a safe work place, specifically on the issue of whether the railroad could have been expected to reasonably foresee his injury. In this regard, Dr. Harrison testified that "university researchers and then the government" began conducting studies in the early 1980s on "keyboard operators [who] ... had developments of carpal tunnel syndrome." Larry M. Jensen, a fellow keyboard clerk with Brewer at Denver & Rio Grande, explained that he had also suffered from carpal tunnel syndrome and had reported problems with his wrists to his "immediate supervisors" by "the last part of [19]89." Additionally, Melvin Miller, a chief clerk at Denver & Rio Grande who "supervises office personnel," testified that it was "obvious to [the railroad's] management that carpal tunnel was around ... before ... Mr. Brewer had his first surgery." Mr. Miller further stated that he had seen a labor union pamphlet about the problems associated with carpal tunnel syndrome when he was working as an assistant chief clerk for Denver & Rio Grande in "[19]87 or shortly after." Finally, Kathy Holt, who works for Denver & Rio Grande as a supervisor of the company's clerks, testified that the railroad began using recessed desks with a lowered area for the keyboard sometime around the mid–1980s. Ms. Holt explained that about the same time, Denver & Rio Grande began providing some of its employees with adjustable chairs and wrist rests, supportive devices on which workers could rest their wrists while typing. According to Dr. Harrison, using such equipment is important to prevent development of carpal tunnel syndrome, because it allows

keyboardists "to get [themselves] in the best possible position to do keying" by adjusting the keyboard and chair up and down until their "wrists [are] in a neutral position."

¶ 10 At the close of plaintiff's case, Denver & Rio Grande moved for a directed verdict pursuant to Utah Rule of Civil Procedure 50(a) on the ground that Brewer had introduced insufficient evidence to establish that his injury was foreseeable. The trial court, however, deferred ruling on the motion, instead waiting for all evidence in the case to be presented. Subsequently, at the close of all evidence, Denver & Rio Grande reasserted its directed verdict motion based on foreseeability, but the trial court noted that it would postpone ruling on the motion until after the jury had concluded its deliberations.

¶ 11 Prior to the court's sending the jury out for deliberation, both parties submitted proposed jury instructions. As part of its proposal, Denver & Rio Grande offered "Defendant's Proposed Instruction Number CC (Apportionment of Damages)," which read:

If you determine that defendant was negligent and that its negligence caused plaintiff's injury for which he is seeking to recover, it is your duty to then apportion the extent to which plaintiff's injury was caused by defendant's negligence, and award damages, if any, only for its proportionate share of damages. You cannot award damages against defendant for any injury, or portion thereof, which you find to be due to other causes.

The trial court refused to give the jury this instruction, finding it unnecessary because the jury was otherwise "sufficiently instructed that they are only to determine damages ... that exist as a result of the defendant's negligence." Pursuant to Utah Rule of Civil Procedure 51, Denver & Rio Grande therefore objected to the court's refusal to give its proposed instruction CC on the basis that the instruction was needed to properly instruct the jury on damage apportionment.

¶ 12 On February 3, 1999, the jury returned a special verdict finding Denver & Rio Grande negligent, concluding that such negligence caused Brewer's injuries, and awarding Brewer $50,000 in lost income and $50,000 in general damages. Thereafter, the

trial court denied Denver & Rio Grande's first directed verdict motion made at the close of plaintiff's case in a written order dated February 24, 1999. The court held that Brewer had not presented any evidence directly establishing that Denver & Rio Grande actually knew his carpal tunnel syndrome was a foreseeable injury from the typing he did for the railroad, but that a reasonable jury could infer foreseeability from the evidence demonstrating Denver & Rio Grande purchased recessed desks, adjustable chairs, and wrist rests for its clerks in the mid–1980s:

[T]his Court can find nothing in the plaintiff's evidence that would demonstrate actual knowledge on the part of the defendant of a risk of injury based upon the work that its clerical employees, including the plaintiff, were undertaking.

[However,] the evidence of the actual conduct of the defendant during the late 1980's and early 1990's, before the plaintiff's diagnosis, does create an inference that if believed by the jury could provide the basis to conclude foreseeability and therefore, negligence.

During the period of time in question, the defendant did supply its clerical employees at the plaintiff's work site ... with some, and perhaps only one, desk with a recessed keyboard space. A recessed keyboard space is a configuration that would provide a more neutral hand position for an employee entering data on a keyboard. More importantly, the defendant provided what were described as "wrist rests", a device to be attached to the employee's [sic] chairs which would support their wrists while using the keyboard. These actions taken by the defendant prohibit this Court from concluding as a matter of law that a reasonable jury could not conclude or infer that the defendant was unaware of any potential risk.

Following its ruling on defendant's directed verdict motion, the court entered judgment on the verdict on March 9, 1999.

¶ 13 Subsequently, on March 19, 1999, Denver & Rio Grande moved to have the court rule on its second directed verdict mo-

tion made at the close of all evidence, and to grant judgment notwithstanding the verdict. The basis of Denver & Rio Grande's motion was again insufficiency of the evidence—"that plaintiff ha[d] ... [offered] no evidence that would allow a reasonable juror to conclude that [defendant] knew or should have known that its workplace environment reasonably might lead to an employee injury such as plaintiff's alleged carpal tunnel syndrome condition." Brewer responded, and the trial court denied the motion on July 6, 1999. The court ruled:

> [T]he Court determines that there is an evidentiary basis for the jury's findings of negligence in this case. The jury's decision might well have been based on the defendant's provision of at least one recessed desk and wrist supports to the plaintiff's worksite, which the jury could have interpreted as a general awareness on the part of the defendant of the risk of harm to employees using keyboards in the workplace.

Denver & Rio Grande now appeals the judgment of the trial court.

## ANALYSIS

¶ 14 On appeal, Denver & Rio Grande raises three arguments: (1) that the trial court erred by admitting over defendant's objection the causation testimony of Dr. Robert Harrison; (2) that the trial court erred by denying defendant's motions for directed verdict and judgment notwithstanding the verdict because, as the railroad alleges, Brewer failed to present sufficient evidence to prove "reasonable foreseeability of harm"; and (3) that the trial court's refusal to offer Denver & Rio Grande's proposed jury instruction CC was prejudicial error. We address each issue in turn.

### I. CAUSATION TESTIMONY

¶ 15 Denver & Rio Grande first contends that the trial court erred by admitting the expert causation testimony of Dr. Harrison because that testimony was scientifically unreliable and thus inadmissible under *State v. Rimmasch*, 775 P.2d 388 (Utah 1989).[3]

¶ 16 Trial courts enjoy broad discretion in determining whether expert scientific evidence is admissible, *e.g., State v. Crosby*, 927 P.2d 638, 642 (Utah 1996); *Wessel v. Erickson Landscaping Co.*, 711 P.2d 250, 253 (Utah 1985), " 'and such decisions are reviewed under an abuse of discretion standard.' " *State v. Brown*, 948 P.2d 337, 340 (Utah 1997) (quoting *State v. Larsen*, 865 P.2d 1355, 1361 (Utah 1993)). Indeed, this " 'exercise of discretion ... necessarily reflects the personal judgment of the court and the appellate court can properly find abuse only if ... no reasonable [person] would take the view adopted by the trial court.' " *Id.* (quoting *State v. Gerrard*, 584 P.2d 885, 887 (Utah 1978)).

¶ 17 Utah Rule of Evidence 702 governs the admission of expert scientific testimony at trial. That rule provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Utah R. Evid. 702.

¶ 18 In *Rimmasch*, we interpreted the standard for admitting scientific evidence pursuant to Utah Rule of Evidence 702. Under *Rimmasch*, a court must conduct a three-part analysis to determine the admissibility of scientific evidence. First, *Rimmasch* requires a threshold showing that the scientific principles and techniques underlying the expert's testimony are "inherently reliable." 775 P.2d at 398. If the techniques and principles at issue have been "general[ly] accept[ed] ... in the relevant scientific community," the court may take judicial notice of their inherent reliability. *Brown*, 948 P.2d at

---

**3.** Although substantive issues underlying a FELA claim are governed by federal law, "questions of procedure and evidence [are] to be determined according to the law of the forum." *Chesapeake & Ohio Ry. Co. v. Kelly*, 241 U.S. 485, 491, 36 S.Ct. 630, 60 L.Ed. 1117 (1916); *see also, e.g., St.* *Louis Southwestern Ry. Co. v. Dickerson*, 470 U.S. 409, 411, 105 S.Ct. 1347, 84 L.Ed.2d 303 (1985) ("As a general matter, FELA cases adjudicated in state courts are subject to state procedural rules, but the substantive law governing them is federal.").

340 (citing *Rimmasch,* 775 P.2d at 400). If judicial notice is not appropriate, however, "the court must determine whether the party seeking to have the evidence admitted has sufficiently demonstrated the inherent reliability of the underlying principles and techniques." *Crosby,* 927 P.2d at 641 (citing *Rimmasch,* 775 P.2d at 400). This foundational assessment must explore

> such questions as the correctness of the scientific principles underlying the testimony, the accuracy and reliability of the techniques utilized in applying the principles to the subject matter before the court and in reaching the conclusion expressed in the opinion, and the qualifications of those actually gathering the data and analyzing it.

*Rimmasch,* 775 P.2d at 403.

■ ¶ 19 If the proponent of the scientific evidence in question satisfies the threshold requirement of inherent reliability—either by judicial notice or through a foundational showing—the trial court must then consider *Rimmasch*'s second and third requirements. *Brown,* 948 P.2d at 341; *Crosby,* 927 P.2d at 641. "*Rimmasch*'s second requirement is a 'determination that ... the scientific principles or techniques have been properly applied to the facts of the particular case by qualified persons and that the testimony is founded on that work.'" *Brown,* 948 P.2d at 341 (quoting *Rimmasch,* 775 P.2d at 398 n. 7). Finally, *Rimmasch*'s third requirement is a determination of whether the evidence will be more probative than prejudicial as mandated by Utah Rule of Evidence 403. *Crosby,* 927 P.2d at 641 (citing *Rimmasch,* 775 P.2d at 398 n. 8).

■ ¶ 20 In this case, Denver & Rio Grande's sole argument on appeal is that Dr. Harrison's causation testimony was inadmissible under the second prong of *Rimmasch,* i.e., that Dr. Harrison arrived at his opinion by incorrectly applying the methodology he used to assess the cause of Brewer's carpal tunnel syndrome.[4]

¶ 21 In developing his opinion as to the cause of Brewer's carpal tunnel syndrome, Dr. Harrison employed a "qualitative observational methodology" recommended by the National Institute for Occupational Safety and Health in 1979 (the "1979 NIOSH methodology"). Under this methodology, a qualified expert follows five steps to determine whether a medical problem such as carpal tunnel syndrome is work-related: (1) consideration of evidence of the disease and consistency of the diagnosis with the patient's history, (2) assessment of epidemiological data,

4. Denver & Rio Grande asserts that it also challenges the inherent reliability of Dr. Harrison's method itself. However, upon closer examination of the railroad's arguments on appeal, it becomes clear that Denver & Rio Grande's appeal in regard to the admission of Dr. Harrison's causation testimony rests solely on its challenge to the method's application to the facts of this case. Indeed, Denver & Rio Grande's purported arguments as to the inherent reliability of Dr. Harrison's methodology—that Dr. Harrison admitted "the controversy surrounding the issues of whether and under what circumstances keystroking could cause [carpal tunnel syndrome]," that he relied on a literature review article that does not support his ultimate conclusion, and that the "trial court could not have taken judicial notice that ... Dr. Harrison's [method] w[as] inherently reliable"—simply miss the mark. Whether there is "controversy" surrounding the general cause of carpal tunnel syndrome is irrelevant to whether a given method used to diagnose a specific patient's cause is inherently reliable. Likewise, what studies Dr. Harrison relied on in reaching his conclusion run to whether he correctly applied the second step of the methodology he used, not to that method's reliability. And the trial court never took judicial notice of the inherent reliability of Dr. Harrison's methodology but instead required him to lay a foundation in that respect. Moreover, even if Denver & Rio Grande actually does now challenge the inherent reliability of Dr. Harrison's methodology, defendant waived its right to appeal this issue by admitting in its motion in limine that the method used by Dr. Harrison, the 1979 NIOSH methodology, "adhere[s] to the tenets of reliability required by *Rimmasch.*"

Denver & Rio Grande also apparently attacks the admission of Dr. Harrison's causation opinion under the third prong of *Rimmasch,* the trial court's determination of whether the evidence is admissible as more probative than prejudicial under Utah Rule of Evidence 403. However, defendant's one-sentence argument in this regard is offered with neither legal analysis nor case authority, and we therefore decline to address it. As we have repeatedly reminded, this court " 'is not simply a depository in which the appealing party may dump the burden of argument and research.'" *State v. Bishop,* 753 P.2d 439, 450 (Utah 1988) (quoting *Williamson v. Opsahl,* 92 Ill.App.3d 1087, 48 Ill.Dec. 510, 416 N.E.2d 783, 784 (1981)); *see also MacKay v. Hardy,* 973 P.2d 941, 948 n. 9 (Utah 1998).

(3) evaluation of evidence of exposure, (4) appraisal of other potential causes, and (5) evaluation and conclusion. As explained by Denver & Rio Grande's own expert witness, Dr. J. Steven Moore, an expert may follow these steps to systematically collect and evaluate data in determining the cause of a patient's carpal tunnel syndrome:

[The first step is] to assure that you're dealing with a correct diagnosis. For example, in this case, does the documentation in the medical records present a compelling case that, in fact, Mr. Brewer did have carpal tunnel syndrome? ... [T]here's no question [here] that Mr. Brewer had carpal tunnel syndrome....

After you've ascertained exactly what the disease condition is, you then go to the epidemiological literature that describe[s] the factors related to the occurrence of that disease....

Then step three is where you go to the specific job of concern in this case and determine if those circumstances [that you find in the literature] are present....

[Fourth,] you look for a variety of ... non-occupational factors ... that may also have contributed or explained the occurrence of this disease....

Then finally, based upon the review of the above, you reach a conclusion on work-relatedness.

¶ 22 Here, there is no question about whether Dr. Harrison correctly followed the majority of the steps outlined by the 1979 NIOSH methodology in developing his opinion as to the cause of Brewer's carpal tunnel syndrome. Denver & Rio Grande admitted at trial that it "d[id]n't have any objection to Dr. Harrison's qualifications," and it does not raise the issue on appeal. The railroad also concedes that there is "no dispute" as to whether Brewer "has carpal tunnel syndrome," and both Dr. Harrison and Dr. Moore testified that Brewer suffers from the condition, respectively, "without doubt" and without "question." Likewise, never does

Denver & Rio Grande challenge on appeal whether Dr. Harrison observed the epidemiological factors he determined relevant to development of carpal tunnel syndrome to be present at Brewer's work station, or whether Dr. Harrison incorrectly disregarded nonoccupational risk factors as potential causes of Brewer's carpal tunnel syndrome. Indeed, Dr. Harrison testified at length about his observation of the risk factors he had identified as "present" at Brewer's "specific job of concern" in this case:

The risk factors that he has here that I can see from the pictures ..., from talking to Mr. Brewer is the repetitive keying. [R]epetition is a factor that's well known to cause carpal tunnel syndrome.

The second exposure or risk factor is posture. When I look at the pictures, I would describe Mr. Brewer as a leaner, he's kind of leaning forward, perched over the keyboard, and his hands are up....

. . . .

And if he's doing simultaneously the repetitive keying, and he's in the awkward posture, those two factors combined are synergistic, ... they're creating more than double the risk factor....

Likewise, Dr. Harrison further testified at trial that Brewer "d[id]n't have any other reason" for developing carpal tunnel syndrome and that there was nothing "else that could [have] cause[d]" the disease in his wrists.

¶ 23 Rather, Denver & Rio Grande narrowly alleges that Dr. Harrison failed to properly apply the second and fifth steps of the 1979 NIOSH methodology to Brewer's case. Specifically, Denver & Rio Grande contends that Dr. Harrison failed to rely on epidemiological evidence supporting the risk factors he used to assess the cause of Brewer's carpal tunnel syndrome, and that Dr. Harrison formed his opinion as to causation before he examined Brewer's posture at his work station.[5]

5. Denver & Rio Grande further charges that Dr. Harrison's causation opinion was inadmissible under the second prong of *Rimmasch* because of "the divergence between the exacting nature of Dr. Harrison's work with his patients ... and

the lackadaisical, guesswork he used to arrive at the conclusions reached in this case," and because of his "failure to apply the [generally accepted] techniques [for] identifying causes to [carpal tunnel syndrome]" by "measur[ing] and

## A. Risk Factors: Epidemiological Evidence

¶ 24 To determine whether Brewer's carpal tunnel syndrome was caused by his work as a clerk at Denver & Rio Grande, Dr. Harrison examined two risk factors, repetitive typing and inappropriate posture due to the railroad's furniture. Dr. Harrison explained that repetition "is a factor ... well known to cause carpal tunnel syndrome." Similarly, Dr. Harrison attested that, if combined with other risk factors, poor posture in the form of wrist extension such as that exhibited by Brewer can cause carpal tunnel syndrome by "placing stress across the wrist and causing eventual damage to the nerve." Moreover, Dr. Harrison testified, when both of these risk factors are present, they combine to work "synergistic[ally]," exacerbating the potential effect one factor would have had on the wrist by itself.

¶ 25 In support of his examination of these two risk factors, Dr. Harrison relied on a recent epidemiological literature review conducted by NIOSH, which addressed four risk factors as potential causes of carpal tunnel syndrome: repetition, force, posture, and vibration. That review concludes,

> There is **strong evidence** for a relationship between exposure to a combination of risk factors (e.g., force and repetition, force and posture) and CTS [carpal tunnel syndrome].... Based on the epidemiological studies reviewed above, especially those with quantitative evaluation of the risk factors, the evidence is clear that exposure to a combination of job factors studied (repetition, force, posture, etc.) increases the risk for CTS. This is consistent with the evidence that is found in the biomechani-

cal, physiological, and psychosocial literature.

Nat'l Inst. for Occupational Safety and Health, U.S. Dep't of Health and Human Services, Publication No. 97–141, *Musculoskeletal Disorders and Workplace Factors: A Critical Review of Epidemiological Evidence for Work–Related Musculoskeletal Disorders of the Neck, Upper Extremity, and Low Back* 5a–28 (Bruce P. Bernard ed., 1997) (emphasis in original). In addition to this review, Dr. Harrison testified at trial that he had relied on "dozens" of other studies finding repetition and posture to be risk factors for carpal tunnel syndrome. For instance, one article co-authored by Dr. Harrison and published in the *Journal of the American Medical Association* described six potential risk factors connected with carpal tunnel syndrome. That article states, "Work-related risk factors associated with [cumulative trauma disorders] include (1) repetition, (2) high force, (3) awkward joint posture, (4) direct pressure, (5) vibration, and (6) prolonged constrained posture. For example, ... [k]eyboard use often requires wrist extension, ulnar deviation, and sustained localized pressure at the wrist crease." David M. Rempel et al., *Work–Related Cumulative Trauma Disorders of the Upper Extremity*, 267 JAMA 838, 838 (1992). Likewise, another article authored by Denver & Rio Grande's own expert witness, Dr. Moore, analyzed "repetitive forceful exertions," "repetitive static exertions," "awkward postures," "hand-arm vibration," "localized mechanical compression," and various combinations of these variables as risk factors for development of carpal tunnel syndrome. *See* J. Steven Moore, *Clinical Determination of Work–*

---

quantify[ing] plaintiff's work exposures." These arguments, however, miss the point. The only relevant question under the second prong of *Rimmasch* is whether the expert "properly applied" the methodology *in question* "to the facts of the particular case," 775 P.2d at 398 n. 7, not whether the expert failed to apply *different* methodologies that could have been used alternatively—even if such methodologies are "exacting" or "generally accepted." Moreover, Dr. Harrison explained to the trial court that he based his opinion on Brewer's use of the keyboard for "an average of four hours a day," and that this knowledge was adequate since he needed to know only how long Brewer used the keyboard,

not how many keystrokes he typically made: "It's my opinion that we don't need to know the exact number of keystrokes. We need to know how many hours he was working at the computer ..., working at the keyboard. Clearly if he's there for a minute, it's different from four hours. But it's sufficient to know for the diagnosis of carpal tunnel syndrome that ... he's working there for four hours.... [T]he duration of keyboard use in many of the studies was the only thing that was ever measured. Some studies measure the number of keystrokes, but many studies just measure the total number, the total hours of keyboard use...."

*Relatedness in Carpal Tunnel Syndrome*, 1 J. Occupational Rehabilitation 145, 155 (1991).

¶ 26 Despite this evidence, Denver & Rio Grande argues that because Dr. Harrison also professed to rely on an article entitled *Methodological Limitations in the Study of Video Display Terminal Use and Upper Extremity Musculoskeletal Disorders*, which found in part that "[m]ethodological limitations and inconsistent results have limited conclusions that can be made from ... studies of the associations between keyboard use and upper extremity disorders," he erred in applying the second step of the 1979 NIOSH methodology by failing to rely on epidemiological evidence supporting his assessment of what risk factors may have influenced the onset of Brewer's carpal tunnel syndrome. Fredric Gerr et al., *Methodological Limitations in the Study of Video Display Terminal Use and Upper Extremity Musculoskeletal Disorders*, 29 Am. J. Indus. Med. 649, 649 (1996). However, the substance of this article attempts, not to discredit the risk factors a doctor might use to assess the cause of a specific patient's carpal tunnel syndrome, but to establish the need for additional standardized studies to determine more precisely how much exposure to video display terminal use may lead to repetitive disorders such as carpal tunnel syndrome generally. *See id.* at 654–55 ("Research to determine associations between VDT [video display terminal] use and upper extremity disorders will contribute maximally to our understanding only if measures of both exposure ... and adverse health effect ... are standard, objective, and valid."). More importantly, Dr. Harrison's mere citation to this study cannot now undermine the trial court's determination that he correctly followed step two of the 1979 NIOSH methodology if the court had before it other sufficient foundational evidence upon which it could have determined Dr. Harrison properly assessed the epidemiological risk factors relevant to the facts of this case. As explained above, we review such determinations "'under an abuse of discretion standard,'" *State v. Brown*, 948 P.2d 337, 340 (Utah 1997) (quoting *State v. Larsen*, 865 P.2d 1355, 1361 (Utah 1993)), and we will reverse "'only if ... no reasonable [person]

would take the view adopted by the trial court.'" *Id.* (quoting *State v. Gerrard*, 584 P.2d 885, 887 (Utah 1978)). Accordingly, in light of Dr. Harrison's reliance on the NIOSH literature review study finding "**strong evidence** for a relationship between exposure to a combination of risk factors," such as repetition and posture, and carpal tunnel syndrome—along with his reference to two other articles employing the very risk factors he used in determining the cause of Brewer's ailment—we cannot say that the trial court abused its discretion by rejecting Denver & Rio Grande's arguments that Dr. Harrison failed to properly apply step two of the 1979 NIOSH methodology to the facts of this case.

### B. Dr. Harrison's Causation Conclusion

¶ 27 Denver & Rio Grande also argues that Dr. Harrison did not correctly follow step five of the 1979 NIOSH methodology, which requires that experts form their causation conclusions based upon the review of the information found in the other four steps of the methodology, because he allegedly arrived at his conclusion before adequately examining Brewer's posture at his work station. Specifically, Denver & Rio Grande asserts that Dr. Harrison formed his causation opinion before assessing Brewer's posture because Dr. Harrison issued "his report on causation" and gave "his first discovery deposition" before he reviewed "a set of photographs of plaintiff's work station with plaintiff actually seated there, and the depositions of plaintiff's ergonomic experts who viewed plaintiff's actual worksite." In support of this argument, defendant correctly cites the proposition that "[c]oming to a firm conclusion first and then doing research to support it is the antithesis of [science]." *Claar v. Burlington N. R.R. Co.*, 29 F.3d 499, 502–03 (9th Cir.1994).

¶ 28 However, it is clear from the record that the trial court possessed a sufficient foundation to determine that Dr. Harrison had in fact properly applied the fifth step of the 1979 NIOSH methodology to the facts of Brewer's case by first examining his medical records; assessing and observing the relevant risk factors, including posture; ruling

out any possible nonoccupational causes; and then coming to his ultimate conclusion. In fact, Dr. Harrison's so-called "report on causation," dated October 20, 1997, demonstrates on its face that it does not represent Dr. Harrison's final conclusion as to causation. That document references Brewer's "repetitive use of his hands and fingers" as a "well-known risk factor for carpal tunnel syndrome," but then specifically hedges when it discusses posture. The document states, "In addition, it is *likely* that Mr. Brewer had an *additional* ergonomic stressor in the form of prolonged static posture while using a typewriter or keyboard. The medical and scientific literature supports a causal connection between ergonomic stressors and carpal tunnel syndrome." (Emphasis added.) The obvious implication from this statement is, not that Dr. Harrison prematurely assumed Brewer's carpal tunnel syndrome was caused by unobserved and undocumented postural problems, but that inappropriate posture may in part cause carpal tunnel syndrome and that it would be necessary to ascertain whether Brewer in fact suffered from such a risk factor in his position at Denver & Rio Grande.

¶ 29 Importantly, by the time of his first deposition, conducted on February 23, 1998, Dr. Harrison possessed detailed information concerning Brewer's work station at Denver & Rio Grande. Dr. Harrison testified at trial that poor posture and wrist extension are "unfortunately common when people work at th[e] kind of furniture" Brewer used at the railroad, and it is undisputed that Dr. Harrison had examined seven photographs of Brewer's hands, chair, and work station taken in early October 1997 prior to this first deposition.

¶ 30 Moreover, Dr. Harrison's open-mindedness as to his causation assessment, apparent throughout his first deposition, provided further evidence directly undermining Denver & Rio Grande's argument that he had arrived at his conclusion before assessing Brewer's posture. In his first deposition, Dr. Harrison actually identified three risk factors possibly present at Brewer's work site: repetition, posture, and "direct mechanical compression." Later in his analysis, however,

Dr. Harrison eliminated direct mechanical pressure from the keyboard on Brewer's wrists as a possible inducement of Brewer's carpal tunnel syndrome, because he did not observe its presence at Brewer's work station. Conversely, Dr. Harrison testified at trial that his subsequent examination of additional information related to Brewer's posture only "confirmed" what he had previously found. For example, by the time of Dr. Harrison's second deposition, conducted less than two weeks after the first deposition, on March 6, 1998, he had received a second set of photographs showing Brewer seated at his work station at the railroad. Dr. Harrison explained that from these photographs he was able to ascertain that Brewer's wrists were extended approximately thirty degrees, which confirmed his earlier determination from the first set of photographs that Brewer suffered from postural problems while he typed for Denver & Rio Grande. Similarly, Dr. Harrison explained that the reports of ergonomists Dell Felix and Paul France, who measured the angle of Brewer's arms, hands, and wrists while seated at his work station, further corroborated his determination that Brewer's posture while typing was a risk factor for development of his carpal tunnel syndrome.

¶ 31 Consequently, we hold that the trial court possessed a sufficient evidentiary foundation to determine that Dr. Harrison assessed possible postural problems affiliated with Brewer's work station before coming to his conclusion concerning causation and, thus, that the court did not abuse its discretion in dismissing Denver & Rio Grande's argument that Dr. Harrison did not properly apply the fifth step of the 1979 NIOSH methodology to the facts of Brewer's case. A reasonable person clearly could have taken the view of the trial court that Dr. Harrison correctly applied both the second and fifth steps of the 1979 NIOSH methodology to the facts of this case, *see State v. Brown,* 948 P.2d 337, 340 (Utah 1997), and we therefore further hold that the trial court did not abuse its discretion in admitting the causation testimony of Dr. Harrison.

## II. SUFFICIENCY OF THE EVIDENCE

¶ 32 Denver & Rio Grande's second argument on appeal is that the trial court erred by denying its motions for directed verdict and for judgment notwithstanding the verdict because, as the railroad asserts, Brewer "failed to present sufficient evidence" demonstrating that Denver & Rio Grande knew or reasonably should have known his injury could have resulted from use of its equipment.

¶ 33 When a party challenges a trial court's denial of a motion for directed verdict or judgment notwithstanding the verdict on the basis of insufficiency of the evidence, "we follow one standard of review: We reverse only if, viewing the evidence in the light most favorable to the prevailing party, we conclude that the evidence is insufficient to support the verdict." *Heslop v. Bank of Utah*, 839 P.2d 828, 839 (Utah 1992); *see also Scudder v. Kennecott Copper Corp.*, 886 P.2d 48, 52 (Utah 1994) (following *Heslop*); *DeBry v. Cascade Enters.*, 879 P.2d 1353, 1359 (Utah 1994) ("A directed verdict and a judgment n.o.v. are justified only if, after looking at the evidence and all reasonable inferences in a light most favorable to the nonmoving party, 'the trial court concludes that there is no competent evidence which would support a verdict in his favor.'" (quoting *Gustaveson v. Gregg*, 655 P.2d 693, 695 (Utah 1982))). Accordingly, this standard obligates "the appealing party '[to] marshal the evidence in support of the verdict and then demonstrate that the evidence is insufficient when viewed in the light most favorable to the verdict.'" *Heslop*, 839 P.2d at 839 (quoting *Crookston v. Fire Ins. Exch.*, 817 P.2d 789, 799 (Utah 1991)). In other words, demonstrating insufficiency of the evidence requires an appealing party to show that all the evidence in favor of the verdict "cannot support the verdict." *Hansen v. Stewart*, 761 P.2d 14, 18 (Utah 1988); *see also South Cent. Utah Tel. Ass'n v. Auditing Div. of the Utah State Tax Comm'n*, 951 P.2d 218, 226 (Utah 1997); *Seale v. Gowans*, 923 P.2d 1361, 1363 (Utah 1996); *Price–Orem Inv. Co. v. Rollins, Brown & Gunnell, Inc.*, 713 P.2d 55, 58 (Utah 1986).

¶ 34 In this case, Brewer introduced evidence at trial from four witnesses in support of the proposition that his injury was reasonably foreseeable to Denver & Rio Grande. Specifically, Dr. Harrison testified that university and government researchers began conducting studies in the early 1980s on keyboard operators who had developed carpal tunnel syndrome. In addition, another clerk at Denver & Rio Grande, Larry Jensen, testified that he had also suffered from carpal tunnel syndrome and had reported problems with his wrists to his supervisors no later than 1989, two years before Brewer began to suffer pain and numbness in his hands and wrists. Melvin Miller, a chief clerk at Denver & Rio Grande, also testified to the knowledge of the railroad that carpal tunnel syndrome could be caused by keyboarding. He stated that it was "obvious to [the railroad's] management that carpal tunnel was around ... before ... Mr. Brewer had his first surgery," and that he himself had seen a labor union pamphlet about carpal tunnel syndrome sometime around 1987. Finally, Kathy Holt, who supervises the clerks at Denver & Rio Grande, testified that the railroad began using recessed desks, wrist rests, and adjustable chairs sometime around the mid–1980s. According to Dr. Harrison, such equipment is important to prevent development of carpal tunnel syndrome, because it allows keyboardists to adjust their posture until their "wrists [are] in a neutral position."

¶ 35 On appeal, Denver & Rio Grande attempts to attack this evidence as insufficient to support a finding of foreseeability by questioning the weight and credibility of the testimony from Brewer's witnesses, and by pointing to contradictory evidence in support of its own position. For example, in reference to Mr. Jensen's testimony that he had informed the railroad of the problems in his wrists two years before Brewer began showing signs of carpal tunnel syndrome in his hands, Denver & Rio Grande assails the credibility of Mr. Jensen's claim by asserting that he worked at a different part of the rail yard than Brewer, typed slightly longer each day than Brewer did, and "did not complain of any injury from typing until just before plaintiff

did." Similarly, attempting to impair the weight of Mr. Miller's testimony, Denver & Rio Grande argues that there was "no evidence" as to what "the union pamphlet on CTS [carpal tunnel syndrome] ... contained," although the railroad fails to address Mr. Miller's averment that it was "obvious to [the railroad's] management that carpal tunnel was around ... before ... Mr. Brewer had his first surgery." And as to the evidence concerning Denver & Rio Grande's implementation of recessed desks, adjustable chairs, and wrist rests, defendant urges that, rather than inferring from this action the railroad was "general[ly] aware[ ] ... of the risk of harm to employees using keyboards in the workplace," as the trial court ruled was possible, a reasonable jury could have just as easily inferred the railroad purchased the equipment "for comfort." [6]

¶ 36 However, this court has held that " '[t]he existence of contradictory evidence or of conflicting inferences does not warrant disturbing the jury's verdict' " when the sufficiency of the evidence is challenged on appeal. *State v. Boyd*, 2001 UT 30, ¶ 14, 25 P.3d 985 (quoting *State v. Howell*, 649 P.2d 91, 97 (Utah 1982)). Indeed, " '[i]t is the exclusive function of the jury to weigh the evidence and to determine the credibility of the witnesses,' " *State v. Booker*, 709 P.2d 342, 345 (Utah 1985) (quoting *State v. Lamm*, 606 P.2d 229, 231 (Utah 1980)), and we will not overturn a verdict on a challenge to the sufficiency of the evidence "[s]o long as some evidence and reasonable inferences support the jury's findings." *Child v. Gonda*, 972 P.2d 425, 433 (Utah 1998). In this case, Brewer presented evidence and inferences—

e.g., testimony that Mr. Jensen's supervisors knew of the problems in his wrists two years before Brewer began suffering from carpal tunnel syndrome, and that the railroad obtained ergonomically improved office equipment in the mid–1980s allowing typists to achieve neutral wrist posture—from which a reasonable jury could have found Denver & Rio Grande knew, or reasonably should have known, that Brewer could develop carpal tunnel syndrome from typing with the railroad's equipment. To demonstrate otherwise, Denver & Rio Grande is required to marshal the evidence, not simply attack its credibility or offer other contradictory evidence supporting the railroad's position as it does here. "This type of argument, although based on the facts of the case, does not marshal the evidence and persuade us of its insufficiency. Absent a legal argument that [Brewer]'s evidence fails to support a crucial element of his claim[ ] ..., we will not invade the province of the jurors to determine [the evidence]'s credibility or to reverse their decision." *Heslop*, 839 P.2d at 839. Therefore, we rule that the trial court did not err in denying Denver & Rio Grande's motions, based upon insufficiency of the evidence, for directed verdict and judgment notwithstanding the verdict.

## III. PROPOSED JURY INSTRUCTION CC

¶ 37 Finally, Denver & Rio Grande asserts that the trial court committed prejudicial error by refusing to give its proposed jury instruction CC relating to apportionment of damages.

6. Denver & Rio Grande further contends it is "undisputed that defendant provided this equipment for comfort only." However, it is clear from the record that "comfort" was not the only possible motive presented to the jury for Denver & Rio Grande's purchase of this office equipment. When questioned about the railroad's acquisition of the office equipment, Kathy Holt could not state a reason for the purchase, leaving the railroad's motive not as an "undisputed" question of "comfort only," but as an open one:

Q. Did any instructions come with those lowered desks as to why they were lowered or how they were supposed to be placed as far as the keyboard is concerned?
A. No.

....
Q. Did you know why they [the railroad] sent the shipment [of wrist rests] in?
A. No.
Q. Did the railroad send you any kind of instructions at all as to what they were supposed to be used for?
A. No.
Q. They just came. Is that right?
A. Uh-huh (affirmative).
Q. Is that a yes?
A. Yes.
In fact, Denver & Rio Grande itself now argues that another explanation for the purchase could have been the railroad's "trying newer equipment available on the market."

¶ 38 "Whether [a] trial court's refusal to give a proposed jury instruction constitutes error is a question of law, which we review for correctness." *State v. Hamilton*, 827 P.2d 232, 238 (Utah 1992); *see also Ong Int'l (U.S.A.) Inc. v. 11th Ave. Corp.*, 850 P.2d 447, 452 (Utah 1993); *Ramon v. Farr*, 770 P.2d 131, 133 (Utah 1989). However, "[i]t is not error [for a court] to refuse a proposed instruction if the point is properly covered in the other instructions." *State v. Sessions*, 645 P.2d 643, 647 (Utah 1982); *see also, e.g., State v. Robertson*, 932 P.2d 1219, 1231 (Utah 1997); *State v. Miller*, 727 P.2d 203, 206 (Utah 1986); *State v. Wilcox*, 28 Utah 2d 71, 75, 498 P.2d 357, 359 (1972); *State v. Martinez*, 21 Utah 2d 187, 188, 442 P.2d 943, 944 (1968). Indeed, "[w]e review jury instructions in their entirety and will affirm when the instructions taken as a whole fairly instruct the jury on the law applicable to the case." *Robertson*, 932 P.2d at 1231.

¶ 39 The proposed instruction at issue in this case would have instructed the jury to limit any damages awarded Brewer to compensation for injury he suffered as a result of Denver & Rio Grande's negligence. Specifically, the instruction directed the jury to "apportion the extent to which plaintiff's injury was caused by defendant's negligence, and award damages, if any, only for its proportionate share of damages." The instruction continued, "You cannot award damages against defendant for any injury, or portion thereof, which you find to be due to other causes." The trial court refused this instruction, finding the jury to be otherwise "sufficiently instructed that they are only to determine damages . . . that exist as a result of the defendant's negligence."

¶ 40 Viewing the jury instructions offered in this case "in their entirety," *id.*, it is clear that the jury was in fact instructed to award only damages resulting from Denver & Rio

Grande's negligence. Instruction 29, for instance, provided:

> If you find the defendant was negligent and that negligence caused injury to the plaintiff, then it is your duty to award the plaintiff such damages, if any, that you find, from a preponderance of the evidence, will fairly and adequately compensate the plaintiff for *the injury and damage sustained, as a result of the defendant's negligence.*

(Emphasis added.) Likewise, instruction 38 specifically directed the jury to limit its award of damages to those injuries caused by the railroad's negligence. In relevant part, that instruction stated:

> The defendant cannot be held liable for damages arising from symptoms associated with a condition that was not caused by any negligence . . . just because the plaintiff happened to experience those symptoms while performing his duties at work.

¶ 41 Consequently, we conclude that the trial court was correct in finding the jury "sufficiently instructed" to award damages existing "only . . . as a result of the defendant's negligence." Any further instruction in that regard would have been merely duplicative of instructions 29 and 38, which directed the jury, respectively, to award only damages "sustained, as a result of the defendant's negligence," and to refrain from awarding "damages arising from symptoms associated with a condition that was not caused by any negligence." Accordingly, we hold that because the instruction requested by Denver & Rio Grande was "properly covered in the other instructions," the trial court did not err in refusing to give proposed instruction CC.[7] *See Sessions*, 645 P.2d at 647.

---

7. Although we hold that the trial court did not err in refusing to give defendant's proposed instruction CC because that instruction was fully covered by the other instructions offered in the case, we reiterate for purposes of clarity that Brewer brought suit in this case under the Federal Employers' Liability Act. Under Utah law, a defendant is entitled to instruction on apportionment only where comparative negligence is a defense to the action because the "plaintiff's neg-

ligent conduct was a contributing factor in *causing* the injury," *Acculog, Inc. v. Peterson*, 692 P.2d 728, 730 (Utah 1984) (emphasis in original); *see also* Utah Code Ann. §§ 78–27–38 to –40 (1996); *Sullivan v. Scoular Grain Co. of Utah*, 853 P.2d 877, 883–84 (Utah 1993), not where the plaintiff merely exhibited natural conditions such as Brewer's "diabetes, obesity, age, and sedentary habits" alleged here.

## CONCLUSION

¶ 42 We conclude that the trial court did not abuse its discretion in admitting the causation testimony of Dr. Robert Harrison. We further hold that the trial court did not err by denying Denver & Rio Grande's motions for directed verdict and for judgment notwithstanding the verdict on the ground that Brewer had presented insufficient evidence to establish foreseeability of harm. Finally, we hold that the trial court did not err by refusing to offer the railroad's proposed jury instruction CC, the substance of which was fully covered by other instructions given to the jury. Accordingly, the judgment of the trial court is affirmed.

¶ 43 Chief Justice HOWE, Justice DURHAM, Justice DURRANT, and Justice WILKINS concur in Associate Chief Justice RUSSON's opinion.