2003 UT 51

Sherrie JENSEN and Shayne Hipwell, individually, and on behalf of all other heirs of Shelly Hipwell, and Ashley Michele Hipwell and Kaycie Shaylene Hipwell appearing by Shayne Hipwell as Guardian Ad Litem, Plaintiffs and Appellants,

v.

IHC HOSPITALS, INC., dba McKay–Dee Hospital, Michael J. Healy, M.D., and Does I through X, Defendants and Appellees.

No. 20010474.

Supreme Court of Utah.

Nov. 14, 2003.

---

Dee Hospital) for medical malpractice and fraud. The trial court dismissed the fraud claims and refused to allow plaintiffs leave to amend their complaint to allege an agency or privity relationship between Dr. Healy and McKay–Dee for purposes of imputing liability to McKay–Dee for Dr. Healy's actions. The medical malpractice claim proceeded to trial, wherein a jury found that neither defendant was liable for medical malpractice. Plaintiffs appeal.

¶ 2 Plaintiffs contend that the trial court erred in (1) refusing to allow plaintiffs' medical expert to testify concerning the standard of care for McKay–Dee's emergency room physicians, (2) refusing to admit evidence that allegedly constituted admissions by conduct on the part of Dr. Healy, (3) dismissing their fraud claim, and (4) refusing to grant them leave to amend their complaint to allege an agency or privity relationship between Dr. Healy and McKay–Dee. We affirm.

## BACKGROUND

### I. MS. HIPWELL'S TREATMENT AT MCKAY–DEE HOSPITAL

¶ 3 " 'On appeal, we recite the facts from the record in the light most favorable to the jury's verdict....' " *Diversified Holdings, L.C. v. Turner,* 2002 UT 129, ¶ 2, 63 P.3d 686 (quoting *State v. Daniels,* 2002 UT 2, ¶ 2, 40 P.3d 611). We recite the facts in detail because "[a] detailed recitation ... is necessary to understand the complex legal issues presented by this appeal."[1] *Jensen v. IHC Hosps., Inc.,* 944 P.2d 327, 328 (Utah 1997) (*Jensen I*).

¶ 4 Shelly Hipwell was thirty-six weeks pregnant when she entered the emergency room at McKay–Dee Hospital on the morning of December 12, 1988. She complained of sharp epigastric/costal margin pain or, in other words, pain essentially in the area of the liver.

¶ 5 Blood and urine tests were performed. In comparison to previous tests taken during

Richard D. Burbidge, Stephen B. Mitchell, Salt Lake City, Simon H. Forgette, Kirkland, Washington, for plaintiffs.

Merrill F. Nelson, Philip R. Fishler, Salt Lake City, for defendant IHC Hospitals, dba McKay–Dee Hospital.

Elliott J. Williams, Kurt M. Frakenburg, Andrew G. Deiss, Salt Lake City, for defendant Michael J. Healy, M.D.

DURRANT, Associate Chief Justice:

¶ 1 Shelly Hipwell died following a series of events that occurred after she had an emergency cesarian section. Ms. Hipwell's mother and her husband ("plaintiffs") filed suit against Dr. Michael J. Healy and IHC Hospitals, Inc. (doing business as McKay–

---

1. Some of the facts cited in this opinion are a verbatim recitation of the facts stated in our two prior decisions involving these parties.

her pregnancy, the emergency room tests showed that (1) Ms. Hipwell's blood pressure had risen from 90/50 to 124/72, (2) her platelet count had dropped from 315,000 to 172,000, and (3) there were more than trace amounts of protein in her urine for the first time. However, each of the results was still within normal range. No liver function tests were performed while she was in the emergency room. The emergency room physician diagnosed the problem as musculoskeletal pain and prescribed Tylenol.

¶ 6 The following day, Ms. Hipwell returned to the hospital for a previously scheduled ultrasound and "a planned induction of labor." When tests showed that her baby was in distress, however, she was sent to labor and delivery where Dr. Healy performed an emergency cesarian section. On December 14, 1988, Ms. Hipwell's liver ruptured due to a pregnancy related condition known as HELLP Syndrome, and she had to undergo surgery to repair it. Although the rupture was repaired, she experienced other complications that kept her hospitalized.

¶ 7 Plaintiffs claim that the liver rupture and other complications Ms. Hipwell experienced at McKay–Dee were the direct and proximate result of negligence on the part of McKay–Dee and her obstetrician, Dr. Healy, because Ms. Hipwell's condition could have been, but was not, diagnosed or treated earlier. They also claim that an injury Ms. Hipwell suffered later at another hospital was a foreseeable, natural consequence of defendants' actions, and, therefore, defendants should be liable for those injuries as well. We now recite the facts related to that later injury.

## II. MS. HIPWELL'S TREATMENT AT THE UNIVERSITY OF UTAH HOSPITAL AND THE INVOLVEMENT OF ATTORNEY ROGER SHARP IN THE CASE

¶ 8 On December 23, 1988, Ms. Hipwell was transferred to the University of Utah Hospital (the "University Hospital") for further treatment. On January 18, 1989, a physician resident at the University Hospital attempted to perform a sternum bone marrow biopsy on Ms. Hipwell to determine whether her continued low platelet count was due to an infection or a lack of platelet production. During the procedure, however, the biopsy needle punctured Ms. Hipwell's heart and caused her to suffer anoxic [2] brain damage. As a result of this injury, she remained in a persistent vegetative state until her death on May 27, 1992.

¶ 9 Shortly after Ms. Hipwell's heart was punctured, Dr. Healy discussed her case with his brother, attorney Tim Healy. Following this discussion, attorney Healy spoke with the Healys' sister, Diane DeVries. Because Ms. DeVries knew Ms. Hipwell's family, attorney Healy asked her to call them and recommend attorney Roger Sharp, a Salt Lake attorney who specialized in medical malpractice cases. When she did contact the Hipwells, however, she did not tell them that the Healys were her brothers, nor did she tell them that she was Dr. Healy's file clerk.

¶ 10 Ms. Hipwell's family accepted this recommendation and retained attorney Sharp on February 10, 1989, to represent Ms. Hipwell in her medical malpractice case. In addition to investigating the University Hospital, attorney Sharp said he would investigate all other potential sources of malpractice. Three days later, attorney Healy wrote a letter to attorney Sharp, confirming that they had a fee-splitting arrangement between them for the case. Ms. Hipwell's family was not aware, however, of attorney Healy's involvement in the case. Moreover, the letter evidenced that attorney Healy was communicating with Dr. Healy about attorney Sharp's investigation, and it implied that attorney Sharp's investigation of Dr. Healy's treatment should be minimal.

¶ 11 As part of his investigation, attorney Sharp received only a portion of Dr. Healy's and McKay–Dee's medical records. Attorney Sharp forwarded the records to a medical expert who determined, based on the records provided, that Dr. Healy and McKay–Dee were not negligent in their care of Ms. Hipwell while she was at McKay–Dee. Three months after being retained, attorney Sharp and plaintiffs settled Ms. Hipwell's

---

2. Anoxic brain damage results from a lack of oxygen to the brain.

claim against the University Hospital for $250,000. This settlement amount became the focus of a legal malpractice claim against attorney Sharp and attorney Healy, which was later settled for an undisclosed amount. It also led to a new investigation of defendants' medical care of Ms. Hipwell as discussed below.

### III. ATTORNEY SIMON FORGETTE'S INVOLVEMENT IN THE CASE

¶ 12 In July 1989, Ms. Hipwell was transferred to a rehabilitation facility in Washington State. Carol Pederson, a social worker at the facility, contacted attorney Simon Forgette on August 10, 1989, to request that he provide an opinion of the $250,000 settlement in Ms. Hipwell's case and to evaluate the conduct of her attorneys in settling the case.[3] She also forwarded medical records for him to review.

¶ 13 Attorney Forgette met with Ms. Hipwell's family in October and learned that Ms. Hipwell's liver "had been either damaged or had burst" while she was at McKay–Dee. Ms. Hipwell's family orally retained him during the meeting and consequently he wrote to attorney Sharp, requesting a copy of Ms. Hipwell's file. On December 14, 1989, attorney Forgette drafted a retainer agreement, which provided that he was to handle claims against McKay–Dee, the University Hospital, attorney Sharp, attorney Healy, and others. This agreement became critical during the trial on the statute of limitations issue.

¶ 14 Attorney Forgette received attorney Sharp's entire file on February 15, 1990. During his examination of the file, he learned for the first time of attorney Healy's involvement in the case and that attorney Sharp's file did not contain a complete set of medical records. However, plaintiffs delayed filing a

notice of intent to commence suit[4] until December 16, 1991, more than two years after attorney Forgette drafted the retainer agreement.

### PROCEDURAL HISTORY

### I. SUMMARY JUDGMENT

¶ 15 Plaintiffs filed suit against Dr. Healy and McKay–Dee for medical malpractice on July 29, 1992.[5] Following the completion of discovery, the trial court granted summary judgment to Dr. Healy and McKay–Dee on February 21, 1995.[6] The court ruled that the two-year statute of limitations governing medical malpractice actions had run by December 1991 when attorney Forgette filed his notice of intent. Specifically, the court ruled that plaintiffs' oral retention of attorney Forgette on October 19, 1989, "demonstrated that [attorney] Forgette was in possession of facts whereby he knew or should have known that [Ms.] Hipwell's condition was caused or possibly caused by negligence on the part of McKay–Dee Hospital and Dr. Healy." *Jensen I*, 944 P.2d at 331. Plaintiffs appealed.

### II. *JENSEN I* DECISION

¶ 16 In that initial appeal, plaintiffs argued that the trial court erred in granting summary judgment because the statute of limitations was tolled by Dr. Healy's fraudulent concealment of the facts upon which their claims were grounded. *Id.* at 331, 333. Defendants countered that attorney Sharp's investigation of Dr. Healy and McKay–Dee in early 1989 triggered the statute of limitations for the medical malpractice claims against them. *Id.* at 333 n. 4.

¶ 17 In *Jensen I*, we separated the actions of attorney Sharp and attorney Forgette.

---

3. Pederson had permission from Ms. Hipwell's family to discuss the case with attorney Forgette.

4. Section 78–14–8 of the Utah Code provides that a prospective defendant must be served with notice of intent to commence an action before a medical malpractice action may commence. Utah Code Ann. § 78–14–8 (2002).

5. The date for filing a "malpractice action against the health care provider [may] be extend-

ed to 120 days from the date of service of notice," Utah Code Ann. § 78–14–8, or until 60 days after a hearing panel has issued a decision on a prelitigation review request. *Id.* § 78–14–12(3)(a) (2002).

6. The trial court issued a memorandum decision on February 21, 1995, granting summary judgment to defendants, but the order was not signed until March 15, 1995.

First, we concluded that, based on agency law principles, attorney Sharp's investigation could not have started the statute of limitations running. *Id.* at 333. We explained that according to agency law, when an agent acts in concert with others whose interests are adverse to the principal's, the agent's knowledge cannot be imputed to the principal. *Id.* at 333 n. 4. Hence, attorney Sharp's knowledge could not be imputed to plaintiffs for purposes of commencing the statute running because

> attorney Sharp's fee-splitting agreement with attorney Healy and the implication in attorney Healy's letter to attorney Sharp that Sharp's investigation of Dr. Healy's care of [Ms. Hipwell] was to be minimal indicate[d] that attorney Sharp was, at the least, acting in concert with third parties whose interests were adverse to [Ms.] Hipwell's.

*Id.* Although we did not determine that Dr. Healy actually committed fraud, we did conclude that the undisputed facts supporting plaintiffs' allegations of fraud were sufficient to toll the statute of limitations due to agency law principles.

¶ 18 Next, we turned our analysis to attorney Forgette. We noted that the retention of attorney Forgette "had defeated the collusion of Dr. Healy with his brother and attorney Sharp." *Id.* at 335. Therefore, any knowledge that attorney Forgette possessed as plaintiffs' agent should be imputed to them for purposes of commencing the statute of limitations running. However, based on the law of fraudulent concealment, we concluded that a question of fact remained concerning whether Dr. Healy's alleged fraudulent concealment was sufficient to somehow prevent attorney Forgette and plaintiffs "from inquiring into the possibility of medical malpractice on the part of Dr. Healy and McKay–Dee." *Id.* Hence, we remanded the case to the trial court to determine when attorney Forgette discovered or reasonably should have discovered the alleged legal inju-

ry done to Ms. Hipwell in light of the actions taken by Dr. Healy and others. *Id.*

## III. *JENSEN II* DECISION

¶ 19 After our decision in *Jensen I,* one of the defendants, McKay–Dee, requested a rehearing. *Jensen v. IHC Hosp., Inc.,* 944 P.2d 327, 337 (Utah 1997) (*Jensen II* ). It argued that summary judgment in its favor should have been upheld because actions taken by Dr. Healy and attorney Sharp could not be imputed to it for purposes of tolling the statute of limitations. *Id.* Hence, McKay–Dee contended that plaintiffs' claims against it were barred because the statute of limitations started running against it when attorney Sharp conducted his investigation.

¶ 20 In *Jensen II,* we agreed with McKay–Dee that the alleged fraud [7] of one defendant generally cannot be imputed to another defendant for tolling purposes when the other defendant did not participate in the alleged fraud. *Id.* at 338. However, we noted that the rule does not apply if an agency or privity relationship exists between the two defendants. *Id.* Therefore, we remanded the case to the trial court for it to determine (1) whether Dr. Healy was McKay–Dee's agent, and (2) whether "Dr. Healy acted in whole or in part to further the aims of McKay–Dee." *Id.* Moreover, we concluded that if plaintiffs were not able to establish these two facts on remand, Dr. Healy's collusion with attorney Sharp could not be imputed to McKay–Dee for tolling purposes, and plaintiffs' claims against McKay–Dee would be barred. *See id.*

## IV. JOINT MOTION FOR A SEPARATE TRIAL

¶ 21 After our decisions in *Jensen I & II,* defendants filed a joint motion for a separate trial on the statute of limitations issue. They argued that *Jensen I* identified a single distinct issue that would be dispositive if resolved in defendants' favor, namely, "[w]ould a reasonable attorney, presented with the

---

7. In *Jensen II,* we alternated between referring to Dr. Healy's conduct as alleged fraud and fraud. However, since *Jensen I* did not address whether Dr. Healy actually committed fraud, here we will refer to Dr. Healy's conduct as alleged fraud.

Even though we did not adjudicate whether Dr. Healy actually committed fraud, we emphasize that his actions in concert with third parties were sufficient to toll the statute of limitations based on agency law principles.

facts that attorney Forgette knew in December of 1989, have considered investigating a medical malpractice case against Dr. Healy and McKay–Dee." After presenting this issue, defendants stated that "[o]nly if the initial trial resolved this issue in favor of plaintiffs would it be necessary to even address the agency question relating to McKay–Dee."

¶ 22 In attempting to narrowly focus the trial only on what attorney Forgette knew as of December 16, 1989, defendants asserted that this issue "plainly requires only introduction of the facts *known to Forgette* ... coupled with expert testimony regarding what a reasonable attorney would have considered given those facts. By definition, facts *not* known to Forgette as of December[ ] 1989 are immaterial to the question before the trier of fact." Thus, defendants attempted to exclude all evidence of fraudulent concealment and issues pertaining to agency because they wanted the trial focused solely on what attorney Forgette knew and did.

¶ 23 The trial court granted defendants' motion for a separate trial on the statute of limitations issues, but concluded that the trial could not be as narrowly tailored as the defendants requested. Instead, it stated that based on our decision in *Jensen I,* the trial necessarily would include an "inquiry into the effect of any concealment." Hence, its ruling expressly stated that "[i]nquiry regarding the effect of any fraudulent concealment on [Ms. Hipwell's] family's knowledge regarding a possible cause of action [would] be allowed."

## V. MOTION FOR APPROVAL OF SPECIAL VERDICT FORM

¶ 24 Following the trial court's rejection of McKay–Dee's argument that all fraudulent concealment evidence should be excluded, defendants filed a joint motion for approval of a special verdict form. Based on our ruling in *Day v. Meek,* 1999 UT 28, 976 P.2d 1202, they again argued that fraudulent concealment was not an issue for the statute of limitations trial. They did not, however, address the agency issue again directly. Instead, they argued that the jury verdict form

should only address the narrow question originally offered by defendants, namely, "[w]ould a reasonable attorney, presented with the facts that attorney Forgette knew [prior to] December 16, 1989, have considered investigating a medical malpractice case against Dr. Healy and McKay–Dee?"

¶ 25 With respect to their proposed question, defendants then stated, "[i]f the jury answers 'yes', judgment must be entered in favor of defendants. If the jury answers 'no', the statute of limitations defense will have failed and the case will proceed to trial on the medical negligence claims."

¶ 26 Plaintiffs rebutted defendants' motion by submitting their own proposed special verdict form, which provided the jury should address the following question only: "Prior to December 16, 1989, did attorney Forgette discover or under the circumstances is it reasonable that he should have discovered the legal injury done to Shelly Hipwell by Dr. Healy and McKay–Dee Hospital?" Plaintiffs did not propose that the jury should also address the separate issue of whether Dr. Healy was McKay–Dee's agent. The trial court adopted plaintiffs' proposed special verdict form and denied defendants' motion.

## VI. PLAINTIFFS' MOTION IN LIMINE AND THE STATUTE OF LIMITATIONS TRIAL

¶ 27 Approximately two months after the trial court adopted plaintiffs' proposed special verdict form, plaintiffs filed a motion in limine to have the issues of agency and privity excluded during the statute of limitations trial. Plaintiffs argued that our ruling in *Day* eliminated the need for them to prove fraudulent concealment because *Day* "makes clear that a showing of fraudulent concealment is only required in the event that there is a contention that the claim is brought beyond the four year statute of repose."

¶ 28 Instead of attempting to show fraudulent concealment, plaintiffs argued that they only had to prove that the legal injury was not discovered until after December 16, 1989. Although evidence of fraud would be relevant to the issue of when plaintiffs should have

reasonably discovered the injury, the evidence would not be "put in … to prove fraudulent concealment, but [would] simply [be] part of the facts and circumstances that the jury [would] consider in determining when plaintiffs discovered or should have discovered their cause of action for medical negligence." Hence, it was "irrelevant to the statute of limitations issue whether [McKay–Dee] participated in the concealment or whether Dr. Healy was an agent of or in privity with [McKay–Dee]." McKay–Dee opposed plaintiffs' motion based on its reading of *Jensen II*.

¶ 29 The trial court heard oral argument on plaintiffs' motion in limine. During the hearing, McKay–Dee responded to an argument made in plaintiffs' brief that McKay–Dee had waived its right to have the jury consider the agency issue. McKay–Dee made clear that its original position regarding the agency issue was contingent on the trial court granting its motion to narrowly tailor the statute of limitations trial.[8] Specifically, McKay–Dee stated

> all along [we] have said to [plaintiffs] we are willing to trade away our right to have the jury hear [the agency issue] if you agree to extract the evidence of fraudulent concealment out of the case. We talked. We have a very narrow trial about what Mr. Forgette knew and what [that] meant. That offer was on the table. We have exchanged letters about that offer. It has never been accepted. . . .

¶ 30 Despite this explanation and our ruling in *Jensen II*, the trial court rejected defendants' argument and granted plaintiffs' motion in limine to exclude the issues of agency and privity from the statute of limitations trial.

¶ 31 Several days later, the statute of limitations trial was held. Although the trial court had initially indicated it would permit evidence of fraudulent concealment to rebut the contention that attorney Forgette had

sufficient information by December 16, 1989, to commence running the statute of limitations, the court excluded all such evidence during trial. Nevertheless, the jury found that attorney Forgette lacked sufficient information by December 16, 1989, to start the statute running against either defendant. Accordingly, the trial court directed that the medical malpractice trial commence against both Dr. Healy and McKay–Dee, even though plaintiffs never proved that Dr. Healy was acting as McKay–Dee's agent.

## VII. PLAINTIFFS' MOTION TO AMEND THEIR COMPLAINT AND DEFENDANTS' MOTION TO DISMISS THE INDEPENDENT FRAUD CLAIM

¶ 32 After prevailing at the statute of limitations trial, but prior to commencing the medical malpractice trial, plaintiffs moved to file a fourth amended complaint for purposes of adding a substantive claim against McKay–Dee. In their prior complaint, plaintiffs alleged that Dr. Healy committed fraud by omitting or misrepresenting material facts with respect to Ms. Hipwell's care. In their proposed amended complaint, plaintiffs sought to include McKay–Dee within this cause of action by alleging Dr. Healy was acting as McKay–Dee's agent and in its interest when he committed the fraud.[9]

¶ 33 Defendants opposed the motion on two grounds. First, defendants argued that the claim was insufficient as a matter of law because no damages could result from this claim according to our ruling in *Jensen I*. In *Jensen I* we stated "[t]he only damages arising out of [plaintiffs'] claims for fraud … relate to the possibility that they were prevented from discovering the facts constituting their claim for medical malpractice." *Jensen I*, 944 P.2d at 336. According to defendants, because plaintiffs discovered the facts constituting their claim for medical malpractice and were proceeding forward on the claim, there could be no damages based on

---

8. McKay–Dee also asserted this position during a pretrial conference before plaintiffs filed their motion in limine.

9. This issue of agency was separate from the agency issue related to the statute of limitations.

Rather than alleging agency for purposes of *tolling* the statute of limitations, the purpose of the amended complaint was to impute *liability* to McKay–Dee for the independent fraud claim against Dr. Healy.

*Jensen I,* and thus, plaintiffs could not sustain their fraud claim.

¶ 34 Second, defendants argued that the claim was dismissed in *Jensen I* because we stated that "[g]iven the specific facts alleged in this case, we cannot agree that [plaintiffs'] fraud claim amounts to anything more than or is different from a claim of fraudulent concealment of medical malpractice." *Jensen I,* 944 P.2d at 336. Hence, defendants argued the fraud claim did not survive *Jensen I* as a separate cause of action. They therefore asked the trial court to deny plaintiffs' motion to amend and to issue an order "confirm[ing] the Supreme Court's dismissal" of the fraud claim.

¶ 35 After reviewing the record and *Jensen I,* the trial court concluded that it was "clear the Supreme Court ... rejected the existence of plaintiffs' independent fraud claim." [10] The trial court, therefore, denied plaintiffs' motion to amend and granted defendants' motion to dismiss plaintiffs' fraud claim.

## VIII. ADMISSIONS BY CONDUCT EVIDENCE EXCLUDED

### A. *Plaintiffs' Motion to Allow Evidence of Admissions by Conduct*

¶ 36 Although the trial court dismissed plaintiffs' fraud claim, plaintiffs filed a Motion to Allow Evidence of Admissions by Conduct on the Part of Defendant Dr. Healy. They argued that Dr. Healy's conduct after Ms. Hipwell suffered an anoxic brain injury "betray[ed] an awareness of [his] guilt or liability" for negligence. Therefore, plaintiffs requested that they be allowed to present such evidence to the jury as admissions by conduct.

¶ 37 Specifically, plaintiffs sought to introduce the following evidence to demonstrate that Dr. Healy manipulated Ms. Hipwell's legal representation so that he could avoid liability:

(1) Dr. Healy discussing the case with his brother, attorney Healy;

(2) Dr. Healy's sister, Ms. DeVries, referring plaintiffs to attorney Sharp without telling them that she was related to Dr. Healy;

(3) Attorney Healy entering into a fee-splitting arrangement with attorney Sharp without plaintiffs' knowledge;

(4) Attorney Healy stating in a letter to attorney Sharp that he had told Dr. Healy that plaintiffs "had not expressed any concern or dissatisfaction over his treatment";

(5) Dr. Healy providing only a portion of his medical records to attorney Sharp;

(6) Attorney Sharp minimally investigating Dr. Healy's medical care of Ms. Hipwell;

(7) Dr. Healy's visiting Ms. Hipwell after her release from the University Hospital so he could render an opinion to attorney Sharp about her life expectancy;

(8) Dr. Healy telling attorney Sharp that Ms. Hipwell's life expectancy was short, which allegedly prompted a fast settlement;

(9) Dr. Healy admitting that he knew the settlement amount was inadequate and that he told his brother this; and

(10) Dr. Healy attempting to preclude liability in the present action by claiming the protection of the medical malpractice release form that was signed during the settlement.

¶ 38 Dr. Healy opposed plaintiffs' motion on two grounds. First, he argued that since plaintiffs' fraud claims were dismissed, they should not be allowed to circumvent the "ruling by bringing in their fraud allegations through the back door." Second, he argued that the proffered evidence did not demonstrate an admission of negligence, especially since most of it "relate[d] to conduct of third parties," and if it were allowed it would be unfairly prejudicial.

¶ 39 Dr. Healy specifically countered plaintiffs' proffered evidence with the following explanations:

(1) He did not have ill motives when he told his brother about Ms. Hipwell's case.

---

10. The term "independent fraud claim" refers to plaintiffs' cause of action for fraudulent concealment. This cause of action is separate from plaintiffs' allegations of fraudulent concealment for purposes of tolling the statute of limitations.

Rather, over dinner with some of his family, he simply related a tragic incident that had happened with one of his patients.

(2) Actions taken by attorney Healy, Ms. DeVries, or attorney Sharp were not his conduct, nor were they indicative of his state of mind.

(3) Attorney Healy did tell him that plaintiffs had expressed no concern over his treatment, but attorney Healy relayed that information in the context of telling him that attorney Sharp would be making a routine request for Dr. Healy's medical records.

(4) Dr. Healy did provide only a portion of his medical records to attorney Sharp. However, in the portion not provided, plaintiffs pointed to only two documents as being incriminating and neither of them were in existence until after the date Dr. Healy produced his records to attorney Sharp.

(5) Dr. Healy did provide his opinion about Ms. Hipwell's status at the request of attorney Healy and attorney Sharp. He did indicate it looked grim. How they used his opinion, though, was not evidence of any admission by conduct.

(6) Dr. Healy did express his dismay at the settlement amount because he believed it was too low.

(7) Dr. Healy did make a legal argument based on the medical malpractice release form, but legal arguments should not constitute admissions by conduct.

¶ 40 The trial court held a hearing on plaintiffs' motion and concluded that the "dismissal of plaintiffs' fraud claim [did] not render inadmissible probative evidence that Dr. Healy obstructed justice as regards a potential medical malpractice claim against him." Moreover, the court recognized that the "wrongdoing by a party 'amounting to an obstruction of justice,' *State v. Garcia,* 663 P.2d 60, 65 (Utah 1983) (other citation omitted), can be regarded as an admission by conduct." Hence, the court granted plaintiffs' motion, but only "to the extent plaintiffs [had] evidence of Dr. Healy's *direct* conduct from which a *reasonable* inference could be drawn that such conduct amounted to an obstruction of justice."

¶ 41 Two days later, the court clarified its ruling. It specified that the letter from attorney Healy to attorney Sharp likely would be inadmissible as an admission by conduct because it was not Dr. Healy's direct conduct. It deferred making a ruling on the other proffered evidence, however, until a foundation was laid at trial.

### B. Evidence of Admissions by Conduct Excluded at Trial

¶ 42 During their opening statement, plaintiffs told the jury that there had been attempts to conceal Ms. Hipwell's medical malpractice cause of action. They mentioned that attorney Healy was associated with Ms. Hipwell's attorney and was reporting information back to Dr. Healy. Dr. Healy objected to this reference and the court sustained the objection. Plaintiffs attempted two more times to bring up information pertaining to attorney Healy's and attorney Sharp's actions but the court sustained Dr. Healy's objections both times.

¶ 43 Following plaintiffs' opening statement, defendants moved for a mistrial. The court denied the motion but specified that before plaintiffs introduced any evidence of alleged admissions by conduct, they had to alert the court and proffer the testimony.

¶ 44 On the sixth day of trial, plaintiffs alerted the court that they wanted to address (1) Dr. Healy's conversation with his brother, (2) the fact that he had provided only part of his medical records, (3) his visit to Ms. Hipwell at the request of attorney Sharp and his opinion that she would not live long, (4) the subsequent low settlement of the case, and (5) the medical malpractice release.

¶ 45 After reviewing the facts and foundation established during trial, prior case law, and the context in which the evidence would be admitted, the trial court determined there was no "direct nexus between the conduct" and the alleged "cover-up of a medical malpractice [claim]." Instead, there was only an inferential connection, which was insufficient to constitute admissions by conduct. Additionally, the court held that the conduct was "too prejudicial and inadequately probative

to be allowed," and it would confuse the jury. Therefore, it excluded the evidence.

## IX. TESTIMONY OF PLAINTIFFS' MEDICAL EXPERT EXCLUDED

¶ 46 The trial court also excluded certain testimony of plaintiffs' medical expert. Approximately three weeks before the substantive trial on plaintiffs' medical malpractice claim, defendants filed a joint motion in limine to exclude selected testimony of Dr. Greggory R. DeVore, an obstetrician/gynecologist with a subspecialty in maternal-fetal medicine.

¶ 47 Defendants sought to preclude Dr. DeVore from testifying about the standard of care for emergency room physicians at McKay–Dee on various grounds, including the following: (1) he was not an emergency room physician, (2) he had no special training in emergency medicine, (3) he was not board certified in emergency medicine, (4) he had not reviewed any emergency medicine literature regarding the standard of care for an obstetrical patient in her third trimester, (5) he was unfamiliar with the learned treatises and authorities in the field, and (6) he had not worked in an emergency room since his residency more than ten years earlier.

¶ 48 Plaintiffs argued that Dr. DeVore was qualified to testify because he was the Corporate Director of Maternal–Fetal Medicine for IHC at the time Ms. Hipwell was treated at McKay–Dee (an IHC hospital). As such, he was familiar with McKay–Dee's medical policies and procedures for emergency room physicians on how to treat women in the third-trimester of pregnancy, and, therefore, should be allowed to testify about the standard of care. The trial court disagreed.

### A. The Trial Court's Ruling

¶ 49 The trial court held that Dr. DeVore could testify as a medical expert on various issues pertaining to Ms. Hipwell's care, provided a proper foundation was laid and his qualifications were established. "With specific regard, however, to testimony addressing Ms. Hipwell's emergency room care," the trial court found that Dr. DeVore was "*not*

*qualified* to testify regarding her treatment during triage stages, specifically prior to her being diagnosed as needing obstetric care." (Emphasis added.)

¶ 50 On the second day of trial, plaintiffs readdressed the issue. They argued that Dr. DeVore should be able to testify that the applicable standard of care required the emergency room physician to follow-up with an obstetrician once he had obtained the information on Ms. Hipwell. The trial court rejected plaintiffs' argument and reiterated that Dr. DeVore was "not qualified to testify about what emergency room physicians ought to be doing up until [the] time that" an obstetrician is brought in as a consultant. However, the trial court did allow plaintiffs to elicit testimony from Dr. DeVore concerning what was significant to an obstetrician about the emergency room records.

### B. Additional Foundation Laid Concerning Dr. DeVore's Qualifications

¶ 51 Following this ruling, plaintiffs laid the following additional foundation during direct examination. Dr. DeVore testified that he had the "opportunity to visit hospitals and teach doctors ... in the IHC system the standard of care when obstetrical patients with these kind[s] of complaints and this kind of information [like Ms. Hipwell's] [were] presented at the emergency room." He also testified he had "the opportunity to teach doctors, including emergency room doctors, on what doctors at any stage [in treatment] should do with information [on] a third trimester obstetric patient with [Ms. Hipwell's] symptoms." Finally, he testified that, according to his observations, the standard of care for emergency room physicians was the same at all the hospitals where he had worked with respect to obstetric patients presenting Ms. Hipwell's symptoms.

### C. Objection to Further Testimony and Motion for a Directed Verdict

¶ 52 After this foundation was laid, plaintiffs again attempted to elicit testimony from Dr. DeVore about the standard of care for emergency room physicians. The trial court

sustained defendants' objection to such testimony.

¶ 53 Plaintiffs offered no competent testimony thereafter concerning what the standard of care was for emergency room physicians and whether that standard was breached when Ms. Hipwell was treated at McKay–Dee. As a result, McKay–Dee moved for a partial directed verdict on plaintiffs' emergency room malpractice claim, which the trial court granted.

¶ 54 Because the court granted a partial directed verdict, it later instructed the jury that it was "not to consider any claims of negligence against McKay–Dee Hospital or its agents or employees only arising out of the care provided or not provided to [Ms.] Hipwell during her visit to the emergency room at McKay–Dee Hospital on December 12, 1988." However, the jury was allowed to consider plaintiffs' other claims of negligence against McKay–Dee and Dr. Healy for the care Ms. Hipwell received after her emergency room visit.

## X. JURY'S VERDICT

¶ 55 At the conclusion of the trial, the jury rendered a verdict that both Dr. Healy and McKay–Dee were not negligent in their care of Ms. Hipwell. Plaintiffs appeal. We have jurisdiction pursuant to Utah Code Ann. § 78-2-2(3)(j) (2002).

## ANALYSIS

### I. STANDARD OF REVIEW

¶ 56 Whether a trial court correctly interpreted a prior judicial opinion is a question of law that we review for correctness. *See State v. Montoya*, 887 P.2d 857, 858 (Utah 1994); *Amax Magnesium Corp. v. Utah State Tax Comm'n*, 874 P.2d 840, 842 (Utah 1994).

¶ 57 "If a case involves a mixed question of fact and law,[11] we afford some measure of discretion to the [trial] court's application of" law to facts. *State v. Hansen,*

11. "A mixed question involves 'the application of law to fact or, stated more fully, the determination of whether a given set of facts comes within the reach of a given rule of law.' " *State v.*

2002 UT 125, ¶ 26, 63 P.3d 650 (citing *State v. Pena,* 869 P.2d 932, 937 (Utah 1994)). "The measure of discretion afforded varies, however, according to the issue being reviewed." *Id.* (citing *Pena,* 869 P.2d at 937–38). When the issue involves whether to admit or exclude evidence, the measure of discretion afforded is broad. *Pena,* 869 P.2d at 938; *see also Diversified Holdings, L.C. v. Turner,* 2002 UT 129, ¶ 6, 63 P.3d 686; *Brewer v. Denver & Rio Grande W. R.R.,* 2001 UT 77, ¶ 16, 31 P.3d 557. Under such circumstances, we will not reverse a trial court's decision unless it "was beyond the limits of reasonability." *State v. Hamilton,* 827 P.2d 232, 239–40 (Utah 1992).

## II. PLAINTIFFS' CLAIMS AGAINST MCKAY–DEE ARE BARRED BY THE MEDICAL MALPRACTICE STATUTE OF LIMITATIONS

¶ 58 On appeal, plaintiffs contend that the trial court erred in (1) refusing to allow plaintiffs' medical expert to testify concerning the standard of care for McKay–Dee's emergency room physicians, (2) refusing to admit evidence that allegedly constituted admissions by conduct on the part of Dr. Healy, (3) dismissing their fraud claim, and (4) refusing to grant them leave to amend their complaint to allege an agency or privity relationship between Dr. Healy and McKay–Dee.

¶ 59 McKay–Dee contends that the trial court did not err as plaintiffs allege, but even if it did, plaintiffs' claims against it are barred based on the law of the case established in *Jensen II.* We first address McKay–Dee's argument because it is dispositive with respect to McKay–Dee. In *Jensen II,* we concluded that plaintiffs' claims against McKay–Dee were barred by the medical malpractice statute of limitations unless plaintiffs proved that there was an agency or privity relationship between Dr. Healy and McKay–Dee. Plaintiffs failed to do so. Hence, we conclude that, pursuant to the law of the case doctrine, plaintiffs' claims against McKay–Dee are barred by the statute of limitations.

*Hansen,* 2002 UT 125, ¶ 26 n. 3, 63 P.3d 650 (quoting *State v. Pena,* 869 P.2d 932, 936 (Utah 1994)).

### A. Medical Malpractice Statute of Limitations and Jensen II's Directive to Establish Agency

#### 1. Discovery of the Legal Injury

██ ¶ 60 Section 78–14–4 of the Utah Code specifies that "[n]o malpractice action against a health care provider may be brought unless it is commenced within two years after the plaintiff or patient discovers, or through the use of reasonable diligence should have discovered the injury, whichever first occurs." Utah Code Ann. § 78–14–4(i) (2002).

¶ 61 Previously, we clarified that discovery means discovery of the "legal injury," or in other words, "discovery of [both the] injury and the negligence which resulted in the injury." *Foil v. Ballinger*, 601 P.2d 144, 148 (Utah 1979). "A [plaintiff] need not have certain knowledge of negligence in order to have 'discovered' it. All that is necessary is that the [plaintiff] be aware of facts that would lead an ordinary person, using reasonable diligence, to conclude that a claim for negligence may exist." Model Utah Jury Instructions 6.37 (1993); *accord Collins v. Wilson*, 1999 UT 56, ¶ 19, 984 P.2d 960 (" '[D]iscovery of legal injury . . . encompasses both awareness of physical injury and knowledge that the injury is or may be attributable to negligence.' " (quoting *Chapman v. Primary Children's Hosp.*, 784 P.2d 1181, 1184 (Utah 1989))); *Hove v. McMaster*, 621 P.2d 694, 696 (Utah 1980).

¶ 62 Here, plaintiffs retained attorney Sharp on February 10, 1989, to represent Ms. Hipwell in a medical malpractice case. *Jensen I*, 944 P.2d at 329. As part of his investigation, he agreed to investigate all potential sources of malpractice. In April 1989, he retained a medical expert to review Dr. Healy's and McKay–Dee's care of Ms. Hipwell to determine whether they had actually committed malpractice. Hence, by April 1989, attorney Sharp had sufficient information to start the statute of limitations running because he knew Ms. Hipwell's injuries might have been caused by negligence on the part of Dr. Healy and McKay–Dee. We nevertheless concluded in *Jensen I* that attorney Sharp's knowledge could not be im-

puted to plaintiffs based on agency law principles.

#### 2. Agent's Knowledge Imputed to Principal

██ ¶ 63 Generally under agency law, a "principal is chargeable with, and bound by, the knowledge of . . . his agent." 3 Am. Jur.2d *Agency* § 281, at 784 (1986); *accord Wardley Better Homes & Gardens v. Cannon*, 2002 UT 99, ¶ 16, 61 P.3d 1009. However, "it is well established that, where the agent has interests in the transaction adverse to the principal's, or where the agent colludes with third parties whose interests are adverse to the principal's interests, knowledge of the facts at issue will not be imputed to the principal." *Jensen I*, 944 P.2d at 333 n. 4 (citing 3 Am.Jur.2d *Agency* § 290, at 794 (1986)).

¶ 64 Applying these principles in *Jensen I*, we concluded that "at the least, [attorney Sharp acted] in concert with third parties whose interests were adverse to Shelly Hipwell's." *Id.* at 334. Moreover, since Dr. Healy was one of those third parties who acted in concert with attorney Sharp, we concluded that attorney Sharp's investigation could not have started the statute of limitations running so as to preclude plaintiffs from filing a claim against defendants. *Id.* Hence, even though attorney Sharp was plaintiffs' agent, his knowledge could not be imputed to them for purposes of triggering the statute of limitations.

#### 3. Actions of One Defendant Cannot Be Imputed to Another Defendant Who Had No Involvement in the Adverse Dealings or Fraud

¶ 65 Following our ruling in *Jensen I*, McKay–Dee asked for a rehearing. *Jensen II*, 944 P.2d at 337. It argued that the trial court's grant of summary judgment in its favor should have been upheld because actions taken by Dr. Healy and attorney Sharp could not be imputed to it for purposes of tolling the statute of limitations, and, therefore, because plaintiffs did not file a claim against it until more than two years after attorney Sharp's investigation triggered the statute of limitations, summary judgment was appropriate.

¶ 66 We granted a rehearing, and in *Jensen II* we specifically addressed "whether Dr. Healy's alleged fraud [could] also act to toll the statute of limitations as to McKay–Dee." [12] *Id.* at 338. We noted that generally the alleged fraud of one defendant cannot be imputed to another defendant for tolling purposes. *Id.* However, we also noted that this rule applies only if there is no agency relationship between the two defendants. *Id.* Hence, we concluded that if there was an agency or privity relationship between Dr. Healy and McKay–Dee, then the actions that Dr. Healy took in concert with others could be imputed to McKay–Dee for tolling purposes. *Id.* However, if plaintiffs were not able to prove agency or privity, then plaintiffs' claims against McKay–Dee were barred.[13] *Id.* Therefore, it was incumbent upon plaintiffs to prove agency based on the "law of the case" doctrine.

### B. "Law of the Case" Doctrine

¶ 67 The "law of the case" doctrine specifies that when a legal "decision [is] made on an issue during one stage of a case," that decision "is binding in successive stages of the same litigation." *Thurston v. Box Elder County*, 892 P.2d 1034, 1037 (Utah 1995) (citation omitted). Particularly when an appellate court makes a pronouncement

on a legal issue, "[t]he lower court must not depart from the mandate, and any change with respect to the legal issue[ ] governed by the mandate must be made by the appellate court that established it." *Id.* at 1038. This is true even if the lower court "believe[s] that the issue could have been better decided in another fashion." *Id.* While an appellate "court may reconsider its own prior decision," it will do so only under exceptional circumstances because "good sense and the desire to protect both court and parties against the burdens of repeated reargument" militate against doing so. *Id.* at 1038–39 (quotations and citations omitted).

### 1. Plaintiffs' Actions on Remand

¶ 68 In *Jensen II*, we concluded that plaintiffs' actions against McKay–Dee were barred by the statute of limitations unless plaintiffs established an agency or privity relationship between Dr. Healy and McKay–Dee. *Jensen II*, 944 P.2d at 338. This became the law of the case. On remand, however, plaintiffs not only failed to establish agency, they actively sought to exclude the issue from the statute of limitations trial.

¶ 69 After the trial court granted defendants' motion for a separate trial on the statute of limitations issue,[14] plaintiffs filed a motion for approval of a special jury verdict

12. We did not determine in *Jensen I* that Dr. Healy actually committed fraud. Instead, we reviewed the facts that supported the allegations of fraud, and based on those facts, we determined that, at a minimum, attorney Sharp acted in concert with Dr. Healy and others whose interests were adverse to plaintiffs' interests. We therefore concluded that the statute of limitations was tolled based on agency law principles. Because *Jensen II* involved a rehearing of our *Jensen I* decision, the issue in *Jensen II* necessarily remained whether the actions of Dr. Healy and attorney Sharp could also toll the statute of limitations with respect to McKay Dee based on agency law principles.

13. By implication, this means that even though attorney Sharp engaged in activities adverse to plaintiffs' interests, his knowledge could still be imputed to them for purposes of starting the statute of limitations with respect to McKay–Dee. Although typically an agent's knowledge will not be imputed to its principal when an agent is involved in fraud or other adverse dealings, an exception exists for innocent third parties. Under agency law, "the adverse dealings or fraud of an agent cannot alter the legal effect of his knowledge ... with respect to his principal in

regard to third persons who had *no connection whatever with such agent in relation to the perpetration of the adverse dealings or fraud.*" 3 Am. Jur.2d *Agency* § 290, at 796 (1986) (emphasis added); *accord Sussel Co. v. First Fed. Sav. & Loan Ass'n*, 307 Minn. 199, 238 N.W.2d 625, 628 (1976); *State Farm Fire and Cas. Co. v. Sevier*, 272 Or. 278, 537 P.2d 88, 96 (1975) ("[O]ne who selects an agent and delegates authority to him should incur the risks of the agent's infidelity or want of diligence rather than innocent third persons." (citations omitted)); *Crystal Ice Co. v. First Colonial Corp.*, 273 S.C. 306, 257 S.E.2d 496, 498 (1979).

This exception explains why it was necessary for plaintiffs to establish an agency relationship between Dr. Healy and McKay–Dee and why attorney Sharp's investigation potentially could start the statute of limitations running with respect to McKay–Dee but not with respect to Dr. Healy.

14. Section 78–12–47 of the Utah Code expressly provides that a statute of limitations issue may be tried separately in a medical malpractice action. Utah Code Ann. § 78–12–47 (2002).

form. Rather than arguing that the jury had to address the issue of whether Dr. Healy was McKay–Dee's agent, plaintiffs proposed only one question for the jury, namely, when did attorney Forgette discover Ms. Hipwell's legal injury? The trial court granted plaintiffs' motion; hence, the jury was presented with no other question than the one proposed by plaintiffs.

¶ 70 In addition to proposing only one question for the jury, plaintiffs filed a motion in limine to exclude the issues of agency and privity from the statute of limitations trial. Plaintiffs argued then and now that they no longer had to prove agency or privity because we changed our *Jensen II* mandate in the subsequent case of *Day v. Meek*, 1999 UT 28, 976 P.2d 1202. We disagree.

### 2. *Day v. Meek* Did Not Modify Our Ruling in *Jensen II*

¶ 71 *Day* involved the interpretation of the medical malpractice statute of limitations. *See id.* at ¶ 5. Section 78–14–4 of the Utah Code provides that a medical malpractice claim must be brought within two years after discovery of the injury, but it is "not to exceed four years after the date of the alleged act, omission, neglect or occurrence." Utah Code Ann. § 78–14–4 (2002). Thus, it contains both a statute of limitations and a statute of repose period.

¶ 72 The section also has two exceptions providing that in cases where a foreign object is left in the body or the cause of action is fraudulently concealed, action must be commenced within one year of discovery.[15] *Id.* *Day* involved the foreign object exception. In interpreting the meaning of the foreign object exception, we deemed it necessary to also interpret the meaning of the

fraudulent concealment exception. *See Day*, 1999 UT 28 at ¶ 17, 976 P.2d 1202. We concluded that the two exceptions applied only after the four-year statute of repose had run. *Id.* at ¶ 21. They did not operate to shorten the statute of limitations period from two years to one year.

#### a. Plaintiffs' Interpretation of *Day*

¶ 73 According to plaintiffs, *Day* modified *Jensen II* because it "clarified that fraudulent concealment only comes into play *after* the four-year repose period . . . has expired." Plaintiffs therefore argued that fraudulent concealment is not applicable to the two-year statute of limitations. Thus, rather than attempting to prove fraudulent concealment, they sought to introduce evidence of concealment only to help the jury determine when plaintiffs discovered the legal injury. Moreover, plaintiffs argued that since fraudulent concealment did not have to be proved, agency issues were also irrelevant. Specifically, plaintiffs argued,

> where, as here, the "two years from discovery" statute of limitations is involved, *issues of fault, agency and privity are irrelevant.* The issue is simply when should the plaintiff have reasonably discovered the negligence claim. Acts of a defendant which conceal the claim are clearly relevant to when the claim should have been discovered *regardless of who performed the acts of concealment or who is legally responsible for those acts.*

(Emphasis added.)

#### b. Common Law Fraudulent Concealment Exception

¶ 74 Plaintiffs read *Day* too broadly. Admittedly, in *Day*, we interpreted the statu-

---

15. Section 78–14–4(1) reads as follows:

(1) No malpractice action against a health care provider may be brought unless it is commenced within two years after the plaintiff or patient discovers, or through the use of reasonable diligence should have discovered the injury, whichever first occurs, but not to exceed four years after the date of the alleged act, omission, neglect or occurrence, except that:

(a) In an action where the allegation against the health care provider is that a foreign object has been wrongfully left within a patient's body, the claim shall be barred unless commenced within one year after the plaintiff or patient discovers, or through the use of reason-

able diligence should have discovered, the existence of the foreign object wrongfully left in the patient's body, whichever first occurs; and

(b) In an action where it is alleged that a patient has been prevented from discovering misconduct on the part of a health care provider because that health care provider has affirmatively acted to fraudulently conceal the alleged misconduct, the claim shall be barred unless commenced within one year after the plaintiff or patient discovers, or through the use of reasonable diligence, should have discovered the fraudulent concealment, whichever first occurs.

Utah Code Ann. § 78–14–4 (2002).

tory fraudulent concealment exception. 1999 UT 28 at ¶¶ 17–21, 976 P.2d 1202. However, we did not modify the common law principle of fraudulent concealment that may be used to toll a statute of limitations. Hence, while section 78–14–4(1) contains a specific statutory exception to the statute of repose, we now clarify that common law fraudulent concealment may still toll the two-year statute of limitations when a claim falls within the four-year statute of repose.

■■■■■ ¶ 75 Generally a "statute of limitations begins to run upon the happening of the last event necessary to complete the cause of action." *Warren v. Provo City Corp.*, 838 P.2d 1125, 1128–29 (Utah 1992) (quotations and citations omitted). However, we have recognized three circumstances where a statute of limitations is tolled "until the discovery of facts forming the basis for the cause of action." *Id.* at 1129 (quotations and citations omitted). The three circumstances where the "discovery rule" applies are as follows:

> (1) in situations where the discovery rule is mandated by statute; (2) in situations where a plaintiff does not become aware of the cause of action because of the defendant's concealment or misleading conduct; and (3) in situations where the case presents exceptional circumstances and the application of the general rule would be irrational or unjust. . . .

*Id.* (footnotes omitted).

■■■ ¶ 76 Both of the first two circumstances apply in this case because (1) section 78–14–4(1) specifies that the two-year statute of limitations does not begin to run until discovery of the legal injury and (2) plaintiffs have alleged that the discovery of the legal injury was delayed due to fraudulent concealment. Merely because a statute incorporates a discovery rule does not mean that the common law fraudulent concealment exception also cannot be invoked. This is illustrated by *Berenda v. Langford*, 914 P.2d 45, 51–52 (Utah 1996), wherein we noted that the express terms of a statute mandated application of the discovery rule, but we nevertheless applied "the fraudulent concealment version of the discovery rule" to determine when the plaintiff discovered the facts constituting the cause of action.

¶ 77 Thus, contrary to plaintiffs' argument, *Day* simply clarified that the statutory fraudulent concealment exception applies only when a claim is brought after the statute of repose. It did not overturn prior case law regarding the common law fraudulent concealment exception that was addressed in *Jensen II* for purposes of tolling the two-year statute of limitations.

¶ 78 Moreover, our reference to fraudulent concealment in *Jensen I & II* pertained to whether Dr. Healy's alleged fraudulent concealment was sufficient to toll the statute of limitations once plaintiffs retained attorney Forgette. It did not apply to our conclusion that claims against McKay–Dee were barred absent a showing of agency because, as we stated in Part II.A.3, attorney Sharp's investigation was sufficient to start the statute of limitations running with respect to McKay–Dee.

¶ 79 In other words, plaintiffs had two different hurdles to overcome with respect to the statute of limitations. First, they had to prove there was an agency relationship between Dr. Healy and McKay–Dee in order to toll the statute of limitations that attorney Sharp's investigation would have otherwise started with respect to McKay–Dee. Second, they had to prove Dr. Healy's alleged fraudulent concealment was sufficient to toll the statute of limitations once attorney Forgette became involved in the case. The issue of fraudulent concealment, therefore, had no applicability with respect to the first statute of limitations hurdle, and, consequently, neither did *Day*.

¶ 80 In summary, *Day* did not modify our mandate in *Jensen II*. The law of the case required plaintiffs to prove agency to avoid the two-year statute of limitations bar with respect to McKay–Dee. Plaintiffs' special verdict form and motion in limine directly contravened this mandate and were thus ill-advised. Having failed to establish agency, plaintiffs' claims against McKay–Dee are barred unless McKay–Dee somehow waived this defense. We therefore turn now to a discussion of waiver.

### C. Waiver

¶ 81 Plaintiffs contend that McKay–Dee waived its defense because it argued below that agency did not have to be addressed in the statute of limitations trial. McKay–Dee argued in its motion for a bifurcated trial and in its motion for a special verdict form that the statute of limitations trial should focus solely on the issue of whether "a reasonable attorney, presented with the facts that attorney Forgette knew [prior to] December 16, 1989, [would] have considered investigating a medical malpractice case against [defendants]." Moreover, in its motion for a bifurcated trial, it argued that if the statute of limitations trial were focused solely on the issue it presented, then issues of fraudulent concealment and agency would not have to be addressed. Plaintiffs contend McKay–Dee waived its defense when it argued that the issues of fraudulent concealment and agency did not have to be addressed.

¶ 82 Waiver involves the " 'intentional relinquishment of a known right.' " *Soter's, Inc. v. Deseret Fed. Sav. & Loan Ass'n,* 857 P.2d 935, 939–40 (Utah 1993) (quoting *Rees v. Intermountain Health Care, Inc.,* 808 P.2d 1069, 1073 (Utah 1991) (further citations omitted)). It has "three elements: (1) an existing right, benefit, or advantage; (2) knowledge of its existence; and (3) an intention to relinquish the right." *Id.* at 940 (citing *Rees,* 808 P.2d at 1074–75 (further citations omitted)).

¶ 83 Here, McKay–Dee had the existing right to assert that plaintiffs' claims against it were barred unless plaintiffs proved agency. McKay–Dee knew of its right due to our decision in *Jensen II,* and it acknowledged its awareness of the right in its motion for a bifurcated trial by stating that "[t]he Court ... held that a medical negligence claim against McKay–Dee was barred by the statute of limitations unless the trial court were to find that Dr. Healy was the agent of McKay–Dee." Thus, the first two elements of waiver were met.

¶ 84 Regarding the element of relinquishment, we have held that "the intent to relinquish a right must be distinct." *Sot-*

*er's,* 857 P.2d at 942. Although relinquishment may be express or implied, *id.* at 941, it "will not be implied from doubtful acts." 28 Am.Jur.2d *Estoppel and Waiver* § 160, at 845 (1966). Moreover, the totality of circumstances must be considered when determining if a party waived a right. *Soter's,* 857 P.2d at 941.

¶ 85 In this case, McKay–Dee did assert that agency issues did not have to be addressed during the statute of limitations trial, but it did so within the context of trying to narrow the scope of the trial. First, the motion for a bifurcated trial was a joint motion of both defendants. They proposed that the jury address a single question that would have been dispositive for both defendants if it was resolved in their favor. They proposed that the jury answer the question of whether "a reasonable attorney, presented with the facts that attorney Forgette knew [prior to] December 16, 1989, [would] have considered investigating a medical malpractice case against [defendants]."

¶ 86 Because they wanted the trial focused solely on what attorney Forgette knew by December 1989, defendants argued that facts not known to him due to the alleged fraudulent concealment were "immaterial to the question before the trier of fact." Hence, they argued that all evidence of fraudulent concealment should be excluded. Likewise, they argued that agency issues also were irrelevant to the question they proposed for the jury.

¶ 87 Importantly, however, defendants stated that "[o]nly if the initial trial resolved [their proposed issue] in favor of plaintiffs would it be necessary to even address the agency question relating to McKay–Dee." Hence, rather than waiving the agency issue in the motion for a bifurcated trial, McKay–Dee reserved it. Moreover, McKay–Dee made its agency argument in the context of trying to narrow the scope of the trial to the sole issue defendants presented. When the trial court said it could not be as narrowly tailored as defendants requested, McKay–Dee sought to assert its reserved right.

¶ 88 Second, contrary to plaintiffs' contention, no distinct intent to relinquish the right of agency is evident in defendants' joint mo-

tion for a special verdict form. In their motion, defendants asserted again that the statute of limitations trial should focus only on what attorney Forgette knew by December 1989. They further argued that our ruling in *Day* supported their contention that fraudulent concealment should not be at issue in the trial.

¶ 89 The agency issue was never directly addressed, however, in this second motion. Although defendants did state that if the jury decided against them at the first trial, "the statute of limitations defense will have failed and the case [would] proceed to trial on the medical negligence claims," the statement was not made in the context of McKay–Dee waiving its right regarding agency. Rather, it was made in the context of defendants trying to narrow the scope of trial so as to exclude all evidence of the alleged fraudulent concealment.

¶ 90 Additionally, during oral arguments on plaintiffs' motion in limine to exclude agency issues from the statute of limitations trial, McKay–Dee acknowledged it was "willing to trade away [its] right to have the jury hear [the agency issue] if . . . the evidence of fraudulent concealment [were extracted] out of the case." This shows the contingent nature of McKay–Dee's argument that agency did not have to be addressed at the first trial. Moreover, McKay–Dee represented that it had "exchanged letters about [the] offer" with plaintiffs, but the offer had never been accepted. From this, it appears that plaintiffs were aware that when McKay–Dee asserted that agency issues did not have to be addressed, its assertion was conditioned upon the scope of trial being narrowly focused only on the issue proposed by defendants.

¶ 91 Based on the totality of the circumstances, it is evident that McKay–Dee did not waive its right to assert that plaintiffs had to prove agency to avoid the statute of limitations bar. Its earlier assertions that agency did not have to be addressed were contingent upon the trial being focused solely on what attorney Forgette knew by December 16, 1989, and the acceptance of its proposed jury verdict form. When this did not occur, McKay–Dee asserted its reserved right.

¶ 92 We recognize that when the statute of limitations trial was held, the court did exclude the evidence of fraudulent concealment, even though it had earlier denied McKay–Dee's request to exclude such evidence. By the time this occurred, however, McKay–Dee's ability to waive its right had been terminated already by plaintiffs themselves. When plaintiffs succeeded in having the agency issue excluded through their special verdict form and motion in limine, they removed the issue of waiver from McKay–Dee's hands. Hence, even though the court later excluded the fraudulent concealment evidence, plaintiffs cannot now argue that McKay–Dee waived its right. Having therefore failed to prove that an agency relationship existed between Dr. Healy and McKay–Dee, plaintiffs' claims against McKay–Dee are barred by the statute of limitations.

## III. EXCLUDING THE TESTIMONY OF MS. HIPWELL'S EXPERT REGARDING THE STANDARD OF CARE FOR MCKAY–DEE'S EMERGENCY ROOM PHYSICIANS

¶ 93 Plaintiffs contend the trial court erred in excluding selected testimony of plaintiffs' medical expert. We affirm the trial court's decision on this issue.

### A. Trial Court's Discretion to Admit or Exclude Evidence

¶ 94 Although whether to admit or exclude expert testimony is a mixed question of fact and law, *see State v. Pena,* 869 P.2d 932, 938 (Utah 1994), we afford broad discretion to the trial court on this issue. *Brewer v. Denver & Rio Grande W. R.R.,* 2001 UT 77, ¶ 16, 31 P.3d 557; *Pena,* 869 P.2d at 938.

¶ 95 Additionally, "an appellate court may affirm the judgment appealed from 'if it is sustainable on any legal ground or theory apparent on the record.'" *Bailey v. Bayles,* 2002 UT 58, ¶ 10, 52 P.3d 1158 (quoting *Dipoma v. McPhie,* 2001 UT 61, ¶ 18, 29 P.3d 1225) (further citations omitted).

### B. Elements of Medical Malpractice

¶ 96 To prove medical malpractice, a plaintiff must establish "(1) the stan-

dard of care by which the [physician's] conduct is to be measured, (2) breach of that standard by the [physician]," (3) injury that was proximately caused by the physician's negligence, and (4) damages. *Schuurman v. Shingleton,* 2001 UT 52, ¶ 10, 26 P.3d 227; *Dalley v. Utah Valley Reg'l Med. Ctr.,* 791 P.2d 193, 195 (Utah 1990). Unless "'the propriety of the treatment received is within the common knowledge and experience of the layman,'" the plaintiff is required to prove the standard of care through an expert witness who is qualified to testify about the standard. *Jennings v. Stoker,* 652 P.2d 912, 914 (Utah 1982) (quoting *Nixdorf v. Hicken,* 612 P.2d 348, 352 (Utah 1980)); *Dalley,* 791 P.2d at 195–96.

### C. Trial Court's Ruling

¶ 97 Approximately three weeks before the substantive trial on plaintiffs' medical malpractice claim, defendants filed a motion to preclude plaintiffs' medical expert, Dr. DeVore, from testifying about the standard of care for emergency room physicians. Defendants argued that Dr. DeVore was not qualified to testify about the standard of care for emergency room physicians because he was an obstetrician who lacked sufficient knowledge about the emergency room standard of care to testify as an expert.

¶ 98 The trial court found that while Dr. DeVore was qualified to testify about various issues pertaining to Ms. Hipwell's care, he was not qualified to testify about her treatment in the emergency room "prior to her being diagnosed as needing obstetric care." Hence, at trial, plaintiffs were unable to prove what the standard of care was for emergency room physicians or that it had been breached when Ms. Hipwell was treated at McKay–Dee. As a result, the court granted a partial directed verdict in favor of McKay–Dee with respect to plaintiffs' emergency room malpractice claim and instructed the jury not to consider a claim of negligence against McKay–Dee for the care Ms. Hipwell received in the emergency room.

¶ 99 Plaintiffs contend that the trial court erred in excluding Dr. DeVore's testimony and in granting the partial directed verdict. They also contend that the trial court erred in instructing the jury not to consider the emergency room malpractice claim.

### D. No Reversible Error with Respect to McKay–Dee

¶ 100 "An erroneous decision to admit or exclude evidence does not constitute reversible error unless the error is harmful. An error is harmful if it is reasonably likely that the error affected the outcome of the proceedings." *Cal Wadsworth Constr. v. City of St. George,* 898 P.2d 1372, 1378 (Utah 1995) (internal citations omitted); *accord Jouflas v. Fox Television Stations, Inc.,* 927 P.2d 170, 173–74 (Utah 1996).

¶ 101 Here, plaintiffs are not asserting a claim for negligence against the emergency room physician. Instead, they are seeking to impute liability to McKay–Dee for the alleged negligence of the emergency room physician. We have determined, however, that plaintiffs' claims against McKay–Dee are barred by the statute of limitations. Consequently, McKay–Dee cannot be held liable for the alleged negligence of the emergency room physician. Thus, even were we to assume that Dr. DeVore's testimony was improperly excluded,[16] it is not reversible error because there is no likelihood that the alleged error affected the outcome of plaintiffs' proceedings against McKay–Dee. Similarly, plaintiffs' argument that the trial court erred in granting McKay–Dee a partial directed verdict also fails due to the statute of limitations bar.[17]

---

**16.** We do not decide here whether the trial court actually erred in excluding Dr. DeVore's testimony because "an examination of the correctness of the trial court's rule [702] ruling [is made] unnecessary by finding that any error was harmless." *State v. Hamilton,* 827 P.2d 232, 240 (Utah 1992).

**17.** As we noted in Part III.A, *supra,* we may affirm a trial court's decision on "'any legal ground or theory apparent on the record.'" *Bailey v. Bayles,* 2002 UT 58, ¶ 10, 52 P.3d 1158 (quoting *Dipoma v. McPhie,* 2001 UT 61, ¶ 18, 29 P.3d 1225) (further citations and internal quotations omitted).

### E. No Reversible Error with Respect to Dr. Healy

¶ 102 Plaintiffs also argue that the trial court's decision to exclude Dr. DeVore's testimony constituted reversible error with respect to Dr. Healy. We disagree.

¶ 103 Dr. Healy was not present in the emergency room when Ms. Hipwell was treated. He was not consulted by the emergency room physician regarding what care should be provided, nor, according to the evidence presented at trial, was he made aware of the visit prior to the time he delivered Ms. Hipwell's baby on December 13, 1988. Because Dr. Healy had no involvement in Ms. Hipwell's care while she was in the emergency room, there is no basis for holding him liable for the alleged negligence of the emergency room physician.

#### 1. Instruction to the Jury

¶ 104 Plaintiffs nevertheless contend that the trial court's decision to exclude Dr. DeVore's testimony impacted their claim with respect to Dr. Healy because

[t]he evidence concerning the emergency room malpractice was compelling. . . . Yet, the district court told the jury the emergency room had not been negligent and this claim was dismissed. The jury could have determined that the other claims of negligence against Dr. Healy . . . involving [his] subsequent treatment of [Ms. Hipwell] [were] less egregious and therefore concluded that if what the emergency room did was not negligent, neither was the subsequent treatment.

¶ 105 First, the trial court did not instruct the jury that the emergency room personnel were not negligent. Rather, it merely told the jury that it was not to consider any claim of negligence against McKay–Dee, its agents, or employees for the emergency room care. Furthermore, the instruction was correct because McKay–Dee was not a proper defendant. Hence, we find no reversible error in the jury instruction.

#### 2. Invited Error

¶ 106 Second, plaintiffs' position necessarily presumes that the jury used its own standard to determine whether Dr. Healy was negligent instead of the one it was instructed to follow by the court. This implies that the jury ignored the instructions of law it received and by so doing failed in its duty to disregard what it "personally believe[d] the law is or ought to be." "[W]e will not reverse a jury verdict[, however,] where there is sufficient evidence in the record to support the jury's verdict on legally sound grounds, particularly where the complaining party essentially invited the alleged error." *Cheves v. Williams*, 1999 UT 86, ¶ 20, 993 P.2d 191 (citations omitted).

¶ 107 Plaintiffs have conceded on appeal that Dr. Healy presented sufficient evidence to support the jury's verdict. Moreover, plaintiffs essentially invited the alleged error by introducing information at trial about the emergency room care without providing supporting evidence. The trial court issued a ruling three weeks before trial that Dr. DeVore was not qualified to testify about "Ms. Hipwell's emergency room care . . . during triage stages, specifically, prior to her being diagnosed as needing obstetric care." Despite this ruling, plaintiffs "focused their case on the emergency room in both opening statement and the initial testimony of . . . Dr. DeVore." Hence, the jury heard testimony about Ms. Hipwell's treatment while in the emergency room even though plaintiffs were aware Dr. DeVore likely would not be allowed to testify whether such treatment fell below the standard of care. Therefore, even if the jury improperly engaged in some type of comparative analysis between Dr. Healy's care and that of the emergency room physician in order to determine whether Dr. Healy was negligent, plaintiffs' actions essentially invited the alleged error.

### IV. ADMISSIONS BY CONDUCT

¶ 108 Whether to admit or exclude evidence is a mixed question of fact and law, *State v. Pena*, 869 P.2d 932, 938 (Utah 1994), but we afford broad discretion to the trial court on this issue. *Jensen v. Intermountain Power Agency*, 1999 UT 10, ¶ 12, 977 P.2d 474; *Pena*, 869 P.2d at 938. Hence, we will not reverse a trial court's decision to admit or exclude evidence as a matter of law

unless the court's decision "was beyond the limits of reasonability." *State v. Hamilton,* 827 P.2d 232, 239–40 (Utah 1992).

¶ 109 Here, the trial court concluded that plaintiffs' proffered evidence of admissions by conduct on the part of Dr. Healy was not clear and unequivocal, would be unfairly prejudicial, would confuse the jury, and would unfairly taint McKay–Dee. Therefore, the court excluded the evidence. We affirm the trial court's decision on this issue.

### A. Connection Between Conduct and Cover–Up of Medical Malpractice

¶ 110 Plaintiffs concede that defendants presented sufficient evidence to support the jury's verdict. They argue, nevertheless, that the jury's verdict should be overturned because the exclusion of the alleged admissions by conduct of Dr. Healy "deprived the jury of having all of the relevant evidence in deciding the negligence issues." The crux of plaintiffs' argument, therefore, is that if the jury had been made aware of Dr. Healy's conduct, the inference from the conduct likely would have "satisf[ied] the need for proof of a particular fact essential to" prove negligence. 2 John W. Strong et al., *McCormick on Evidence* § 265, at 193 (4th ed.1992). Thus, we must determine if the connection between Dr. Healy's conduct and the alleged cover-up of medical malpractice was sufficient to support this inference and whether such evidence would have been unfairly prejudicial or would have likely confused the jury.

### B. What Constitutes Admissions by Conduct

¶ 111 Admissions by conduct may be admitted as substantive evidence of the truth of the matter asserted. *McCool v. Gehret,* 657 A.2d 269, 277 (Del.1995). The "wrongdoing by [a] party in connection with its case amounting to an obstruction of justice is ... commonly regarded as an admission by conduct." 2 Strong et al., *supra,* § 265, at 190. This is so because when a party resorts to wrongful devices, it "provide[s] a basis for believing that he or she thinks the case is weak and not to be won by fair means." *Id.*

Hence, the jury is invited to infer a person's guilt from the individual's conduct "[s]o long as the conduct is the sort of behavior a guilty person might resort to in order to" avoid liability. Edward J. Imwinkelried, *A New Antidote for an Opponent's Pretrial Discovery Misconduct: Treating the Misconduct at Trial as an Admission by Conduct of the Weakness of the Opponent's Case,* 1993 BYU L.Rev. 793, 797.

#### 1. Potential to Unfairly Prejudice a Jury

¶ 112 Courts must exercise caution, however, in admitting such evidence because of the uncertainty involved in interpreting conduct, *see State v. Sanders,* 27 Utah 2d 354, 360, 496 P.2d 270, 273 (1972), and its potential to unfairly prejudice a jury. Imwinkelried, *supra,* at 801. When a jury learns of a defendant's wrongdoing, "they might be tempted to return a verdict adverse to the [defendant] as a means of punishing the [defendant] for his misdeed," even if it was not otherwise convinced of the defendant's liability. *Id.*

#### 2. Potential to Confuse or Mislead a Jury

¶ 113 Additionally, admissions by conduct have the potential to confuse or mislead the jury because the introduction of a collateral issue may cause the jurors to "lose sight of the main events on which they should focus." *Id.* at 804. For example, plaintiffs bore the burden in this case of proving that defendants committed medical malpractice when they treated Ms. Hipwell. Introducing the collateral issue of Dr. Healy's later involvement with his brother and attorney Sharp easily could cause the jury to focus on the later acts rather than on the issue of Ms. Hipwell's medical care. *See id.* Hence, a trial court must carefully examine the risk posed by the evidence before it may be admitted to the jury. *Id.* at 805.

#### 3. Admission by Conduct Must be Clear and Unequivocal

¶ 114 Because of the substantial risk posed by alleged admissions by conduct, a trial court should admit such evidence only if it "is satisfied that it constitutes a clear and

unequivocal expression and is therefore a credible substitute for verbal expression." *Sanders,* 27 Utah 2d at 360, 496 P.2d at 273. Our prior case law demonstrates what constitutes a clear and unequivocal expression sufficient to be an admission by conduct.

¶ 115 In *Nelson v. Lott,* 81 Utah 265, 275, 17 P.2d 272, 276 (1932), we concluded that the defendant's numerous falsehoods about an accident were admissions by conduct. In that case, a man was hit by an automobile and pinned under the right front wheel. *Id.* at 269, 17 P.2d at 274. The following day, the defendant denied responsibility for the accident by stating

> that he did not run over [plaintiff's] leg, that he saw the accident, but he did not know who did it; that he knew who was hit, but he did not know who hit him; that he was there and had seen the accident just after it happened; [and] that he did not know who ran over plaintiff.

*Id.* at 275, 17 P.2d at 276. We concluded that the false statements were "indicative of the state of mind of the defendant with reference to the accident"—that they were indicative of his awareness that his case was weak. *Id.* (citation omitted).

¶ 116 In *State v. Garcia,* 663 P.2d 60, 65 (Utah 1983), we concluded that an attempt to escape arrest was an admission by conduct. After a police officer observed the defendant dispose of a body, the officer apprehended the defendant. *Id.* at 62, 65. The defendant then said " 'I will kill you,' to [a] passerby whom the officer had asked to summon help." *Id.* at 65. We concluded that the defendant's statement was an "attempt to counter the officer's effort to obtain help in arresting him," and that such an attempt to escape arrest constituted an admission by conduct. *Id.*

¶ 117 Finally, in *State v. Allen,* 839 P.2d 291, 303 (Utah 1992), we concluded that destruction of evidence constituted an admission by conduct. In *Allen,* a man was convicted of murdering a three-year-old boy after he had physically abused him for several months. *Id.* at 293–95, 297. The man lived with the boy's mother and read her personal diary. *Id.* at 294. Before his arrest, he convinced her to let him destroy

several pages from her diary that related the fights he had had with her over the discipline of her children. *Id.* We concluded that his "conduct was relevant as an admission constituting circumstantial evidence of consciousness of guilt." *Id.* at 303 (citing *Garcia,* 663 P.2d at 65; *State v. Walker,* 226 Kan. 20, 595 P.2d 1098, 1100 (1979)).

¶ 118 Other jurisdictions have concluded that acts such as bribery, intimidation, and concealment of relevant documents also constitute admissions by conduct. 2 Strong et al., *supra,* § 265, at 190–91. With these examples in mind, we turn now to a discussion of Dr. Healy's alleged admissions by conduct.

### C. Dr. Healy's Alleged Admissions by Conduct

¶ 119 After Ms. Hipwell suffered her anoxic brain injury at the University Hospital, Dr. Healy discussed her case with his brother, attorney Healy, over dinner with some of his family. Within a short time, Dr. Healy's sister contacted plaintiffs and referred them to attorney Sharp. She did not tell them, however, that she was related to Dr. Healy.

¶ 120 Plaintiffs retained attorney Sharp to represent Ms. Hipwell in the medical malpractice case. Three days later, attorney Healy wrote a letter to attorney Sharp, confirming that they had a fee-splitting arrangement. Plaintiffs were unaware of this arrangement. Additionally, the letter indicated that attorney Healy had spoken with Dr. Healy and had told him that the plaintiffs "had not expressed any concern or dissatisfaction over his treatment."

¶ 121 As part of his investigation, attorney Sharp requested Dr. Healy's medical records but received only a portion of them. Attorney Sharp forwarded the records to a medical expert who determined that Dr. Healy was not negligent in his care of Ms. Hipwell. During this same period of time, attorney Sharp asked Dr. Healy to render an opinion about Ms. Hipwell's life expectancy. After visiting her at a rehabilitation center, Dr. Healy told attorney Sharp that her outlook was grim. Three months after being re-

tained, attorney Sharp and plaintiffs settled Ms. Hipwell's claim against the University Hospital for $250,000. In doing so, they also gave a medical malpractice release for all practitioners and hospitals that had been involved in her care.

¶ 122 Plaintiffs contend that these actions demonstrate Dr. Healy's "awareness ... of his liability with regard to his care of Shelly Hipwell." We disagree for two reasons.

### 1. The Conduct of Third Parties

¶ 123 First, most of the acts that plaintiffs point to as being admissions by conduct were the actions of third parties. Plaintiffs argue that "[i]t was error for the [trial] court to preclude [plaintiffs] from presenting evidence of what [third parties] did and said in furtherance of the [alleged cover-up]."

¶ 124 To attribute the actions of third parties to a defendant as an admission by conduct, however, "it is not enough to show that a third person did the acts charged." 2 Strong et al., *supra*, § 265, at 191. Rather, plaintiffs must show that the third-party acts were connected to the defendant, *id.*, or that they were acting by authorization or in some capacity for the defendant. *See* 37 Am.Jur.2d *Fraud & Deceit* § 305, at 404 (1968). Here, none of the evidence proffered by plaintiffs showed that the third parties were acting at the behest of Dr. Healy. Indeed, the deposition testimony of attorney Healy indicated the contrary because he testified that Dr. Healy did nothing to suggest attorney Healy or attorney Sharp should become involved in the case. Hence, contrary to plaintiffs' contention, the trial court did not err in excluding this evidence.

### 2. Alternative Explanations of Dr. Healy's Conduct

¶ 125 Second, other plausible explanations exist for Dr. Healy's conduct. Dr. Healy admits that he did discuss Ms. Hipwell's case with his brother over dinner but that given its tragic nature "it would [have been] more unusual if he had not mentioned [it]." More-

over, the context in which his brother told him that plaintiffs "had not expressed any concern or dissatisfaction over his treatment" occurred when his brother "inform[ed] him that [attorney] Sharp would be making a routine request for [his] medical records." This is supported by the letter that attorney Healy sent to attorney Sharp.

¶ 126 In addressing the allegation that he provided only a portion of his medical record, Dr. Healy points out that plaintiffs identified only two documents as being incriminating; yet, neither of them was in existence until after the date Dr. Healy produced his records to attorney Sharp. Moreover, he did not object to plaintiffs' use of the documents "for purposes of proving the [plaintiffs'] medical malpractice claims and, indeed, the [documents] were admitted" for that purpose.

¶ 127 Next, although he did visit Ms. Hipwell for purposes of rendering an opinion about her life expectancy, Dr. Healy contends that his opinion that her outlook was grim was accurate because she was "severely brain damaged and in a persistent vegetative state."

¶ 128 Finally, as an alternative rationale for Dr. Healy's conduct, it is plausible that he wanted his brother involved in the case because he knew an attorney was "probably going to make a lot of money off" of it. While this motive focuses more on attorney Healy's interests than plaintiffs' interests, it does not constitute an admission of negligence.[18] It would account, however, for both the acts of Dr. Healy and the conduct of the third parties. Hence, several plausible reasons exist for Dr. Healy's conduct.

¶ 129 We conclude, therefore, that based on the evidence proffered and the explanations provided, it is not clear and unequivocal why Dr. Healy acted the way he did. Unlike the admissions by conduct discussed in our prior case law, there is doubt in this case about what was meant or intended by his actions. Certainly, we cannot say that his conduct was a "clear and unequivocal expres-

---

18. As our decision in *Jensen I* indicates, the facts show that Dr. Healy acted in concert with others whose interests were adverse to plaintiffs' interests. Our decision did not specify, however, that Dr. Healy's acts betrayed an awareness of his liability so as to constitute admissions by conduct because that question was not before us.

sion [that constitutes] a credible substitute for verbal expression." *Sanders*, 27 Utah 2d at 360, 496 P.2d at 273. Nor can we say that the trial court's decision was beyond the limits of reasonability with respect to its determination that such evidence would be unfairly prejudicial and would confuse or mislead the jury. We therefore affirm the court's decision to exclude Dr. Healy's alleged admissions by conduct.

## V. FRAUDULENT CONCEALMENT

¶ 130 After plaintiffs prevailed at the statute of limitations trial, defendants filed a motion to dismiss plaintiffs' independent fraud claim. Specifically, defendants asked the trial court to issue an order "confirm[ing] the Supreme Court's dismissal" of the claim. The trial court granted defendants' motion after concluding that we clearly "rejected the existence of plaintiffs' independent fraud claim" in *Jensen I.*

¶ 131 Normally, whether a trial court correctly interpreted a prior judicial decision is a question of law that we review for correctness. *See State v. Montoya*, 887 P.2d 857, 858 (Utah 1994); *Amax Magnesium Corp. v. Utah State Tax Comm'n*, 874 P.2d 840, 842 (Utah 1994). Here, however, we need not determine whether the court correctly interpreted our prior decision because we affirm dismissal of plaintiffs' fraud claim on the alternative ground of mootness.

¶ 132 " '[W]e will not adjudicate issues when the underlying [claim] is moot. A [claim] is deemed moot when the requested judicial relief cannot affect the rights of the litigants.' " *Brookside Mobile Home Park, Ltd. v. Peebles*, 2002 UT 48, ¶ 16, 48 P.3d 968 (quoting *Ellis v. Swensen*, 2000 UT 101, ¶ 25, 16 P.3d 1233). In this case, because plaintiffs were not able to prove negligence, their claim for fraud is moot.

¶ 133 In their third amended complaint, plaintiffs asserted a "Fraud/Fraudulent Concealment [Claim] Against Dr. Healy" for conspiring with others to commit fraud and to fraudulently conceal Ms. Hipwell's cause of action for medical malpractice. In *Jensen I,* we stated that plaintiffs' fraud claim was nothing "more than or ... different from a claim of fraudulent concealment of medical malpractice." *Jensen I*, 944 P.2d at 336 (citing *Gillman v. Dep't of Fin. Insts.*, 782 P.2d 506, 509, 511–12 (Utah 1989)). Therefore, we address plaintiffs' independent fraud claim as a cause of action for fraudulent concealment.

¶ 134 "Fraudulent concealment requires that one with a legal duty or obligation to communicate certain facts remain silent or otherwise act to conceal material facts known to him." *Jensen I*, 944 P.2d at 333 (citing 37 Am.Jur.2d *Fraud & Deceit* § 145, at 199–200 (1968)). However, "[s]uch 'concealment or nondisclosure becomes fraudulent only when there is *an existing fact or condition* ... which the party charged is under a duty to disclose.' " *Id.* (emphasis added) (quoting 37 Am.Jur.2d *Fraud & Deceit* § 145, at 200). Absent this fact or condition, there can be no fraudulent concealment.

¶ 135 Consequently, "maintenance of a fraud action against a physician for concealing substandard medical treatment necessarily involves a finding of [negligence].... Without a finding of negligence, ... plaintiffs lack the requisite predicate for their fraudulent concealment claim." *Wurzberg v. Lapid*, No. 92 Civil 4586(LBS)(NRB), 1993 WL 362374, at *3–4, 1993 U.S. Dist. LEXIS 12799, at *10 (S.D.N.Y. Sept. 16, 1993); *cf. Neuhaus v. DeCholnoky*, No. CV 960153565S, 2000 WL 151194, at *4–5, 2000 Conn.Super. LEXIS 161, at *12 (Conn.Super.Ct. Jan. 20, 2000) (alleging that the derivative claim for fraudulent concealment must fail because the underlying cause of action was not valid).

¶ 136 Here, plaintiffs allege that Dr. Healy fraudulently concealed his malpractice because he did not inform plaintiffs that (1) he had failed to diagnose Ms. Hipwell's condition earlier than he did and, thus, had delayed the delivery; (2) he had not properly monitored her condition after delivery; and (3) he had unnecessarily transferred her to the University Hospital.

¶ 137 Plaintiffs' medical malpractice claim was tried to a jury, however, and the jury found no negligence by Dr. Healy. In-

deed, plaintiffs concede that Dr. Healy presented sufficient evidence to support the jury's verdict. Additionally, because we have affirmed the trial court's decision to exclude Dr. Healy's alleged admissions by conduct, we need not reach the question of whether the exclusion prejudiced the plaintiffs. Hence, there are no grounds for reversing the jury's verdict that there was no negligence. As a result, plaintiffs lack the requisite predicate for their fraudulent concealment claim and their claim is therefore moot. We therefore affirm the trial court's dismissal of plaintiffs' fraud claim on this alternative ground.

## VI. DENIAL OF PLAINTIFFS' MOTION TO AMEND THEIR COMPLAINT

¶ 138 Following the statute of limitations trial, plaintiffs moved for leave to file a fourth amended complaint to include McKay–Dee within its independent fraud claim against Dr. Healy. The trial court denied their motion after concluding that we rejected plaintiffs' independent fraud claim as a matter of law in *Jensen I.* Plaintiffs contend the trial court erred in denying their motion because it misinterpreted *Jensen I.* We affirm on the alternative ground of futility.

### A. Doctrine of Futility

 ¶ 139 Although leave to amend is "freely given when justice so requires," Utah R. Civ. P. 15(a), justice does not require that leave be given "if doing so would be futile." *Benton v. Adams,* 56 P.3d 81, 86 (Colo.2002) (citing 3 James Wm. Moore et al., *Moore's Federal Practice* § 15–15[3] (3d ed.1997)); *see also Andalex Res., Inc. v. Myers,* 871 P.2d 1041, 1046 (Utah Ct.App.1994) (specifying that leave to amend should not be given if newly asserted claim is legally insufficient or futile). "It is well settled that a court may deny a motion to amend as futile if the proposed amendment would not withstand a motion to dismiss . . . ." *Acker v. Burlington N. & Santa Fe Ry., Co.,* 215 F.R.D. 645, 647 (D.Kan.2003) (citation omitted). We therefore turn now to a discussion of plaintiffs' proposed amendment.

### B. Plaintiffs' Proposed Amended Complaint

 ¶ 140 In their third amended complaint, plaintiffs asserted a claim for "Fraud/Fraudulent Concealment Against Dr. Healy," alleging that he conspired with others to fraudulently conceal Ms. Hipwell's cause of action. McKay–Dee was not listed as one of the conspirators.

¶ 141 In the fourth amended complaint, plaintiffs attempted to include McKay–Dee within this claim by alleging that Dr. Healy was McKay–Dee's agent for purposes of imputing liability to McKay–Dee.[19] Specifically, plaintiffs sought to add the following language: "Dr. Healy, acting in furtherance of his efforts with [McKay–Dee] to conceal their medical negligence, and acting as agent for or in privity with [McKay–Dee]," conspired to fraudulently conceal Ms. Hipwell's cause of action. But for this new allegation against McKay–Dee, plaintiffs' proposed amended complaint was the same as its prior complaint in all material respects.

¶ 142 Because we have determined that plaintiffs' independent fraud claim is moot, even were we to remand on this issue, plaintiffs' proposed amendment would not withstand a motion to dismiss. It therefore would be futile to grant plaintiffs' leave to amend their complaint for the purpose of imputing liability to McKay–Dee for Dr. Healy's actions. Hence, we affirm the trial court's denial of plaintiffs' motion to amend on this alternative ground.[20]

## CONCLUSION

¶ 143 Plaintiffs' claims against McKay–Dee are barred by the medical malpractice stat-

---

19. This issue of agency was separate from the agency issue related to the statute of limitations. Rather than alleging agency for purposes of *tolling* the statute of limitations, the purpose of the amended complaint was to impute *liability* to McKay–Dee for the independent fraud claim against Dr. Healy.

20. Affirming on this alternative ground makes it unnecessary for us to reach the question of whether the trial court properly interpreted *Jensen I.*

ute of limitations because they failed to comply with the law of the case established in *Jensen II*. Plaintiffs contend that they did not have to comply with *Jensen II* because it was modified by our subsequent decision in *Day v. Meek*. Plaintiffs read *Day* too broadly; it did not modify our holding in *Jensen II*. Moreover, McKay–Dee did not waive its agency defense as plaintiffs assert. Thus, plaintiffs' claims against McKay–Dee are barred by the statute of limitations.

¶ 144 Next, the trial court's decision to preclude plaintiffs' medical expert from testifying about the standard of care for emergency room physicians did not prejudice plaintiffs. Because plaintiffs' claims against McKay–Dee are time-barred, plaintiffs cannot impute liability to McKay–Dee for the alleged negligence of the emergency room physician. Additionally, because Dr. Healy played no part in the care Ms. Hipwell received in the emergency room, there is no basis for holding him liable for the care she received there. Hence, even were we to assume the trial court erred in excluding the testimony, the error would not have affected the outcome of the proceedings, and thus, there was no reversible error.

¶ 145 Moreover, the trial court did not err in excluding evidence of Dr. Healy's alleged admissions by conduct. Because of the uncertainty involved in interpreting conduct, and the substantial risk involved in inviting a jury to infer that a person's conduct constituted an admission of liability, admissions by conduct must be clear and unequivocal. Here, Dr. Healy's conduct was not a clear and unequivocal expression of a consciousness of liability because a number of plausible reasons exist for his behavior. Because it is not clear why Dr. Healy acted as he did, we cannot say the trial court's decision to exclude such evidence was beyond the limits of reasonability. We thus affirm its decision in this regard.

¶ 146 Further, we affirm dismissal of plaintiffs' independent fraud claim, which we determined in *Jensen I* to be a claim for fraudulent concealment, on the ground of mootness. The jury found no negligence by Dr. Healy. Without a finding of negligence, plaintiffs lack the requisite predicate for their fraudulent concealment claim because there was nothing to conceal. Hence, the jury's verdict rendered plaintiffs' fraudulent concealment claim moot. As a result, we need not determine whether the trial court correctly interpreted our decision in *Jensen I* when it concluded that we clearly "rejected the existence of plaintiffs' independent fraud claim."

¶ 147 Finally, we affirm the trial court's denial of plaintiffs' motion to amend their complaint because the amendment would be futile. Plaintiffs sought leave to amend their complaint to impute liability to McKay–Dee for the alleged fraud of Dr. Healy. Because plaintiffs' independent fraud claim against Dr. Healy is moot, however, even were we to remand on this issue, plaintiffs' proposed amendment would not withstand a motion to dismiss and is therefore futile. We thus affirm the trial court's denial of plaintiffs' motion on this alternative ground.

¶ 148 The judgment of the trial court is affirmed.

¶ 149 Justice WILKINS, Justice PARRISH, Judge NEHRING, and Judge MEMMOTT concur in Associate Chief Justice DURRANT's opinion.

¶ 150 Having disqualified herself, Chief Justice DURHAM does not participate herein; District Judge JON M. MEMMOTT sat.

¶ 151 Justice RUSSON did not participate herein; District Judge RONALD E. NEHRING sat.